## *In re* ROBINSON C. POWERS.

*Arrest without warrant.. Section* 22 *of the statute of* 1852, *entitled "An Act to prevent traffic in intoxicating liquors &c., considered. Habeas Corpus.*

Officers of government, and in many instances, private citizens, have power to arrest, without warrant, a person disturbing or breaking the public peace.

The provisions of Section 22d of the Statute of 1852, entitled " An Act to prevent traffic in intoxicating liquors for the purpose of drinking," considered in respect to their legality and constitutionality.

Upon *Habeas Corpus*, the relator may controvert the return of the cause of his detention, and also prove any other facts deemed material to the determination of the case.

But upon *Habeas Corpus*, the court will not re-examine the proceedings of the magistrate.

HABEAS CORPUS. Robinson C. Powers, the relator, set forth in his petition that he was imprisoned in the common jail in Woodstock, in the county of Windsor; that he was first committed to said jail on Tuesday, the 8th day of March, 1853, by Lorenzo Richmond, of said Woodstock, Sheriff of said County of Windsor ; that he had been guilty of no offence against the laws of the State of Vermont, or against the common law of the land; that he was committed without any precept in the hands of said Richmond, authorizing him to make such commitment, for any cause whatsoever; that he has been informed that said Richmond committed him as aforesaid, for the reason that he was intoxicated.

*In re* Powers.

That he, the relator, was confined within said jail about twenty hours, and then taken into the ,sitting room of said jail-house, before one Walter Palmer, a justice of the peace, and that said Walter proceeded to examine the relator under oath, and inquired of him where he obtained the liquor on which he became intoxicated, on the day previous to such examination ; and that the relator answered truly all such questions, as well as it was in his power to answer the same, or as has been in his power since to answer the same ; and that because he did not answer all the interrogatories entirely to the satisfaction of the said Walter, he was again recommitted to said jail within the same, and from that day to the present, by order of said Walter, as the relator is informed and believes, he has been locked up in said jail along with a common felon, &c.

That the relator has been informed, that some two or three days after his commitment as aforesaid, and while still in close confinement, some kind of a writing, purporting to be a warrant, has been placed in the hands of the jailer, Mr. Lull, by the said Walter, &c.

A question was made, upon the suggestion of E. Hutchinson, Esq., who said he had been spoken to by the State's Attorney of the county, to assist him, in case this matter should come before the court, whether the court should order notice to the State's Attorney, under the statute, in regard to *Habeas Corpus*, requiring notice to him, when it appears that the person " is imprisoned, on any criminal accusation." The court looked into the return of the officer, and the precept attached, by which the officer returned that he detained the prisoner, which was as follows :

" STATE OF VERMONT,     To any Sheriff or Constable
    *Windsor County, ss.*       in the State,

                                  GREETING.

" Whereas Lorenzo Richmond, Sheriff of said county of Wind-
" sor, on the 9th day of March, 1853, at Woodstock, in said coun-
" ty, brought before me, Walter Palmer, a justice of the peace
" within and for the county of Windsor, Robinson C. Powers, of
" said Woodstock, charging him, the said Powers, with having
" been intoxicated, and disturbing the public and domestic tran-
" quillity at Woodstock aforesaid, on the 8th day of March, 1853 ;

" and the fact being found by me, that the said Robinson C. Pow-
" ers had been intoxicated, and disturbed the public and domestic
" tranquillity, and was by me ordered under oath to disclose the
" place where, and the person of whom, the liquor, so producing in-
" toxication, was obtained, and all the circumstances attending it,
" agreeably to a statute law of the State of Vermont, approved
" November 23d, 1852—and the said Robinson C. Powers having
" neglected and refused so to do—Therefore, .

"By the authority of the State of Vermont, you are hereby
" commanded to take the body of the said Robinson C. Powers,
" and him commit to the keeper of the jail in Woodstock, in the
" county of Windsor aforesaid, within the said prison, who is here-
" by commanded to receive the said Robinson C. Powers, and him
" safely keep until he make such disclosure, or until he be dis-
" charged by me.

" Dated March 10, 1853."

The court ordered, that notice be given to the State's Attorney, who was not in court ; but Mr. Hutchinson, on his behalf, gave assurances, that the matter, on their part, would be ready for hearing on Tuesday morning.

On Tuesday morning, sundry affidavits were read upon both sides, which did not materially conflict, in their statements, in regard to the facts in the case, which were substantially—That late in the afternoon of the 8th day of March 1853, the relator, who resided in the same house with his father, they being the only inmates at the time, and the father very advanced in age, was overheard, from without, using very abusive and boisterous language towards his father. That upon going in, he became quiet, but seemed to be, and was in fact, very thoroughly intoxicated, and very considerably excited. The sheriff was sent for, and took him into custody, and put him in jail, under the provisions of the 22d section of the statute of the last session of the legislature, entitled "An act to prevent traffic in intoxicating liquors, for the purpose of " drinking," which is in these words : " Whenever any person within " this state shall be found in such a state of intoxication as to dis-
" turb the public or domestic tranquillity, any sheriff, deputy sher-
" iff, high bailiff, or justice of the peace for the county, or any con-
" stable, grand juror, or selectman of the town in which such per-

" son is so found, may, without warrant, and it is hereby made their " duty to, apprehend such person so intoxicated, and take and re- " tain him in custody, at the expense of the town in which he is so " found, in any place within the county, in the discretion of the " officer so arresting, until, in the opinion of such officer, the per- " son so detained shall be capable of testifying properly in a court " of justice, and as soon as may be thereafter, bring him before " some justice of the county ; and such person, so found intoxicated, " shall, on oath before such justice, disclose the place where, and " the person of whom, the liquor so producing intoxication was " obtained, and all the circumstances attending it ; and, on the re- " fusal or neglect of such person so to disclose, he may, by such " justice, be committed to the common jail of the county, at the ex- " pense of the town in which he was so found, until he shall so " disclose, or by said justice be discharged.   And in case said jus- " tice shall adjudge, from the evidence, that the sale, furnishing or " giving away of said liquor, was an offence against this act, he " shall forthwith issue his warrant, and cause the person so selling, " furnishing or giving away said liquor, to be brought forthwith " before him, and such proceedings shall be had in the case, in all ." respects, as would have been had if the person so offending had " been regularly prosecuted before such justice, for such offence, " in the manner prescribed in this act.   And any person resisting " the arrest or detention of such person so found intoxicated, by " any of the officers aforesaid, shall be liable to the same penalties " as are provided by law for resisting a sheriff in the execution of " a legal process."

That on the day following, and as soon as he became entirely sober, he was brought before justice Palmer, and an examination had, in regard to the person of whom, and the manner of his ob- taining the liquor, by which he became intoxicated ; and that his answers not being satisfactory to the justice, he was re-committed according to the mittimus before recited.

The affidavits, on the part of the relator, tended to show that he had made a full and satisfactory disclosure, and that the continu- ance of the imprisonment was unnecessary ; and on the part of the state, they tended to show that his disclosures were evasive, contradictory, and unsatisfactory.

*C. P. Marsh* and *A. Tracy* for relator.

*W. C. French* and *E. Hutchinson* for State.

The opinion of the court was delivered by

REDFIELD, Ch. J. The leading question made in the case is, how far that provision in the law, under which the prisoner is committed, is to be regarded as constitutional. This word, constitutional, as applied to laws, has a very narrow range. It is an inquiry, merely, as to the conflict between any act of the legislature and the fundamental law of the state, which is supposed to be embodied in the express provisions of our written state constitution, as limited or enlarged by that of the United States.

It is scarcely necessary, we trust, at this late day, to say, that the judicial tribunals of the state have no concern with the policy of legislation. That is a matter resting altogether within the discretion of another co-ordinate branch of the government. The judicial power cannot legitimately question the policy, or refuse to sanction the provisions, of any law, not inconsistent with the fundamental law of the state. And they would never attempt to do this even, except upon obvious and satisfactory grounds.

The only ground upon which it has been claimed that the statute in question is unconstitutional, is that it conflicts with the 10th and 11th articles of the Bill of Rights of our State Constitution, and with the 4th, 5th and 6th articles of the Amendments of the United States Constitution, embracing the same subject.

It seems to us, that the 11th article of our State Constitution, and the corresponding provisions in the United States Constitution, have no reference to the subject now before the court. It is in these words: "That the people have a right to hold themselves, " their houses, papers and possessions, free from search or seizure ; " and therefore warrants, without oath or affirmation first made, af- " fording sufficient foundation for them, whereby any officer or mes- "senger may be commanded or required to search suspected places, " or seize any person or persons, his, her or their property, not par- "ticularly described, are contrary to that right, and ought not to be " granted." This seems to be directed against general warrants, and general search warrants in particular, not specifically describing the persons, places, or property, to be searched, or arrested. This

class of warrants, which in troublous and unsettled periods in English history, were issued to a very alarming extent, by their secretaries of state, and other magistrates perhaps, was prohibited, at the final settlement of the realm upon the prince of Orange, and the Hanover family, I think, if not earlier; and similar provisions have been transferred to the United States and to most of the State Constitutions. It is very obvious this proceeding is not of that character. And it has never been supposed to prohibit arrests by private persons, or without warrant, in that class of cases where delay would be perilous. Necessity is the first law of government as well as of nature, and is not to be abrogated by implication.

In order to determine how far this proceeding is in violation of the 10th article of the State Constitution, it will be useful to compare the two somewhat carefully, perhaps. The article is in these words:—

" That in all prosecutions for criminal offences, a person hath " the right to be heard, by himself and his counsel; to demand the " cause and nature of his accusation; to be confronted with the wit- " nesses; to call for evidence in his favor, and a speedy public trial, " *by an impartial jury of the country*, without the unanimous con- " sent of which jury he cannot be found guilty; nor can he be com- " pelled to give evidence against himself; nor can any person be " justly deprived of his liberty, except by the laws of the land, and " the judgment of his peers."

It is obvious to remark, upon the slightest view of this article, that if the prosecution under consideration is of the character indicated in this article, the proceedings cannot be maintained. The proceedings indicated in the 22d section of the statute under consideration, possess almost none of the requisites indicated in this 10th article of our Constitution. But we think the proceedings under this statute are not to be regarded altogether as a prosecution for a criminal offence—perhaps not to any extent. The prosecution referred to in this article in the Constitution is obviously the final trial, before the traverse jury, in open court, and would seem to have reference altogether to those courts whose proceedings are according to the course of the common law, and especially to *offences*, properly so speaking—" criminal offences," in the words of the article—such as are made punishable by imprison-

ment, or some other personal disability, or at all events by fine. And it is questionable, I think, whether this article was ever intended to have reference to that class of minor offences, which from time immemorial, both in this country and in England, have been made punishable by single magistrates, without any of the appliances, or apparatus, which seem to be indicated in this article. But however that may be, it seems to us that the proceeding indicated in the statute under consideration is not even one of those minor offences punishable by fine only.

The proceeding against the relator was, in the first instance, of a criminal nature, and to some extent, in its inception against him, inasmuch as it deprived him of his liberty, until he became sober, and that induced us to require notice to the State's Attorney. Beyond that, it does not seem to be a proceeding against him; but a sort of court of inquiry against some unknown but suspected person, as guilty of another offence against this same statute, in furnishing the cause of this person's first offence. After the man becomes sober, the statute does not propose to subject him to any restraint, by way of punishment for any offence, but only to secure his testimony against other persons, suspected of some violation of the law, and of aiding in his first guilt.

The inquiry then arises, whether these provisions of the law, in the mode they are proposed to be accomplished, are against any fundamental law of the state, or the United States. The whole matter is very considerably affected in our view, if we settle clearly in our minds, that the legislature are the sole judges how far drunkenness, or those who aid in its perpetration, are punishable criminally. I take it, that at this day, it is scarcely needful for this court to spend words in vindicating this acknowledged right of the legislature. How far the thing is curable by any process of mere legislative restriction, is a matter with which we have here no possible concern. We would be hopeful of all laws, that they are in some sense capable of answering their proposed end. Assuming then, that the legislature have the right to punish drunkenness, and those concerned in its perpetration, or indirect production and commission, it becomes a question of expediency merely how far they will punish it, or in what mode. We should then, to treat this matter fairly, view this subject in the same light we do any other subject of criminal legislation.

*In re* Powers.

Let us then, for the purpose of placing this matter in a different point of view, so as, if possible, to perceive its true bearing, suppose that in the first instance the relator had been guilty of a homicide, which was clearly manslaughter, and the sheriff had been called in, after the whole transaction was ended, and he had taken him into custody and detained him, either in jail or not, for in that respect there is probably no difference.   Is it supposable that any one, even without any special statute, would regard this as unlawful?   And if not, then a special statute requiring it, could not be more so, than the act, without any express law.

And if the legislature should see fit to punish homicide, committed in a state of intoxication, by having the person arrested and detained until he became sober, could he complain of the arrest and detention, without warrant and trial by jury, any more than (if he were still liable to further punishment for the offence,) he could object to the preliminary detention ?   It seems to us it could make no difference, as to the power of the legislature, to order the arrest and detention of one who had committed homicide in a drunken fit, until he becomes sober, whether he was made liable to still further punishment afterwards or not.

What essential difference in principle then will it make, whether the arrest and detention is for disturbing the public peace, in a state of drunkenness, or committing a more grievous offence ?   When we concede to the legislature the right in one case, it follows in the other, unless they are restricted in some way, which is not the case, as it seems to us.   Few persons, at this time, would be inclined to deny the right in the case supposed.   And we think it follows of course, in the case of a breach of the peace in a state of intoxication, as much as in the case supposed.

This portion of the statute is peculiarly expressed, and as it seems to me, needlessly minute in detail.   But that was done probably out of over caution, and to prevent misconstruction of the purpose of the legislature.   It seems to me, that "public and domestic tranquillity" mean nothing more than the public peace.   The public peace is made up of the aggregate of individual peace, and domestic peace is nothing more than a subdivision of the one, and the aggregation of the other.   One cannot lawfully disturb the quiet of domestic life, by that same kind of offensive and tumultuous carriage, which would any where constitute a breach of public peace,

although no one but the family of which he is a member, is present.

The statute then, on a fair construction, we think, provides that if one shall be in that peculiar state of intoxication, whereby his conduct puts those about him in reasonable fear of bodily harm, any sheriff, or other officer named, may take him into custody, and detain him till he is sober enough to testify. This is the first point at which it would be reasonably safe to have such a person go at large. This any citizen might always do, in England or this country, upon the mere ground of preventing the continuance of the disturbance, upon the same ground that one may arrest, without warrant, to suppress a riot. *Spaulding* v. *Preston*, 21 Vt. 9, *and cases cited*, where the subject is fully discussed.

This we think is scarcely to be regarded as in the nature of punishment for a crime or offence, committed by the one arrested, but to prevent the continuance of an offence, or the re-commission of it. And in whatever light it is viewed, to deny the right to the conservators of the public peace throughout our country, would be at once to strike a death blow to the whole police power of the country. If it is not desired to carry the restraint beyond the point of returning soberness, all will perceive at once, the very manifest absurdity of attempting in practice, to apply the provisions of the 10th article of our State Bill of Rights to the matter. A formal complaint and warrant, and a formal jury trial, would be likely to continue quite beyond the term of returning soberness.

After the person arrested is sober, the proceedings seem to us to be of the nature of preliminary proceedings against an unknown person suspected of an offence against the statute, connected with the prisoner. And assuming that such inquiry is in regard to a legally punishable offence, it is not necessary to go further, and inquire whether all the provisions of the statute, in regard to such person, are strictly constitutional. If not objected to by him, the mere witnesses could scarcely raise any such question, certainly not until after some judicial declaration in regard to the matter. This person is then required, not to give testimony against himself, for there is nothing in the statute, or in any statute of the state, which renders him further punishable. But he is required to give testimony in regard to a transaction of which it may fairly be presumed he will ordinarily have knowledge, and in which he has no concern, and which is an offence against the law of the land.

This is not very different from an inquiry before a grand jury. And there is no doubt the court might and would commit a witness refusing to give testimony before a grand jury, unless he had some excuse affecting himself.

I have known joint perpetrators of crime often compelled to give testimony in regard to the transaction, against a co-offender, after having a verdict in their own favor, and no one ever doubted such testimony was legally imperative upon the witness. If one chooses to plead guilty to an offence, there is no doubt he may be required to give evidence against others connected with him, in the perpetration of the crime. And it can make no difference that the offender is not publicly known, or that the legislature require this preliminary inquiry to be made before a single magistrate. It is the same in law, as if required to be made and the testimony given before this court, or the County Court, and a grand jury. The law supposes that the rights of the witness and the accused will be equally well protected, and the legislature seem to be of a similar opinion, so far as this statute is concerned.

This section of this law is not more stringent than are the powers given to the Probate Court, in relation to requiring persons complained of for embezzlement, to make discovery, and not very different from the general powers of the County Court, in regard to compelling witnesses to give testimony before the court, in the trials before the traverse jury, or before the grand jury. The only thing, as it seems to me, which renders this provision of the statute so anomalous in the eyes of some, and which exposes it to so much criticism, is, that it is a provision of a peculiar character, in some sense, although strictly analogous to others with which we are most familiar, and is not found in this precise form, in regard to any other offence; and secondly, that this inquisition is entrusted altogether to the discretion of a single justice, in the first instance.

But it will be apparent, that if the legislature think this class of offences more difficult of detection than any other, it would be expected they would have resort to other and more strict and searching scrutiny and inquisition in regard to them. And of all this, we do not see how any one can justly complain, or that any one would be likely to complain, if he was, and intended to keep himself, innocent. And whether this shall be conducted by one court or another, is only matter of convenience or taste. But it will be obvious,

that to be of any practical importance, it would have to be confided to a pretty numerous class of persons. This shows our opinion of the perfect legality and constitutionality of this 22d section of the act, so far as this relator or this case is concerned.

We are now to inquire whether there has been any such irregularity in these proceedings, as to entitle the party to be discharged.

We think our statute, in terms, allows the relator to controvert the return of the cause of his detention, or to prove any other facts which the court deem material to the determination of the case. But in the case of *Exparte* Horsley 22 Vt. 363, and in a case in Grand Isle County, on the present circuit, founded on a conviction under the statute of last year upon this same subject, it was considered, that upon *habeas corpus*, the court would not re-examine the proceedings of the magistrate *de novo*. If we were to do that, it would be extending the remedy, by *habeas corpus*, farther than it has generally been extended in this state, and applying it to another class of cases from what it legally applies to.

We think the magistrate has a discretion to determine when the person has made a full and fair disclosure, in regard to the points upon which he is required to disclose. If it were not so, the provision could not practically amount to anything, and would be worse than useless. And we do not perceive why there is any more danger in entrusting him with this discretion, to determine whether he did " refuse to disclose" or when he has "made disclosure," in the language of the act, than to entrust him, or any other court, with a discretion to determine when a witness refuses to give his deposition, or to give testimony in any other form.

If, in a case of this kind, the magistrate should refuse to hear the disclosure, or after it was fairly made, should persist in imprisoning the person, we have no doubt, upon some proper process, this court would devise some mode to compel the magistrate to do his duty. But of course we should not interfere upon any doubtful state of the evidence. We should make the same presumption in favor of the good conduct of the magistrate, to which every one is fairly entitled until the contrary be shown. If we volunteered to interfere and exercise the discretion for the magistrate, in cases of this kind, we should probably have more work of the kind than would be altogether consistent with our other duties.

We should require, in such case, proof of abuse of authority, of a

*In re* Powers.

clear and decided character. And we are not satisfied that any such thing has occurred in the present case, so that we could not interfere here, if the application had been in any other form.

The prisoner must be remanded, and the petition dismissed.

NOTE. It seems to me, that all the proceedings in the administration of the police in the cities, where they have no jury trial whatever, if the offences which they assume to punish by fine and imprisonment come fairly within this provision of the United States Constitution, and of the Constitutions of most of the States, are alto gether void and illegal, and violations of the first principles of the liberty of Englishmen, as defined in *Magna Charta*. But no such idea has ever been entertained. No man ever supposed that every time a policeman arrested a night-walker, or a drunken brawler, in New York or London, he was violating the chartered rights of the citizen or subject, in the manner claimed here.

And it is difficult for me to perceive how any of the criminal prosecutions before magistrates can be fairly vindicated, if they come within the general scope of this article of the Bill of Rights. A jury of six men is not the jury indicated by the United States Constitution or by *Magna Charta*, any more than a jury of three men, or two. And a jury of the country, in the language of our Bill of Rights, means a jury of traverse of twelve men, no doubt. And I do not believe it would be regarded as constitutional for legislatures to provide that in trials for high crimes, punishable by imprisonment in state prison, or other personal disability, the offender should be tried by a jury of two or six men, even. It seems to me we could not give this constitutional provision the wide scope asked for it, without, in effect, breaking down the most efficient and essential powers of our civil government. And we entertain not the least doubt that it was never, in any country where the common law prevails, intended to have any such scope.

And it seems to us the relator has no just occasion to feel that the times are evil beyond all former precedent, or that he suffers beyond all other citizens. Drunkenness, in various ways, has always formed a subject of police regulation in the state. From 1797 to about the year 1820, a law was in force in the state, whereby persons who were in danger of becoming a charge upon the town, by reason of drunkenness, or other dissipation, might, on complaint of the selectmen to two justices, and notice to the person, be absolutely deprived of their property, and they and their families put under guardianship for an indefinite term. That law and others, with different modifications, have almost always existed in the state, and have been enforced when occasion required, and no one supposed any constitutional provision was thereby violated.

And a long acquiescence in regard to constitutional law is as important as any other prescription, and as often resorted to. In my judgment, we could not declare this portion of the law void, without involving, in principle, to a very great extent, the entire police of the state in the same category. For no jury trial is, or ever was, allowed in any of these or similar cases.

I ought perhaps to correct a misapprehension, which some made, in regard to the extent of this decision, that it held that no party prosecuted for an offence under the statute was entitled to a jury trial. No gentleman of the profession would have been liable to any such misapprehension. It was the desire of the court, and my desire, in drawing up the opinion, not to give any intimation beyond the fair scope

of the case before us. The United States Constitution is not referred to, because I supposed it had any binding effect in regard to offences prosecuted in the state courts, but merely to show the form of similar provisions in other constitutions. The United States Constitution guarantees the right of trial by jury in the United States courts. And a similar provision exists in the constitution of this state. And in arguing the extent of either, and of *magna charta,* I supposed it would be understood, that our own state constitution was all that had any controlling effect in this case. But each of these great charters, and the practice under them, throws light upon the common subject. So far from intending to say, that no jury trial was secured by the act, I supposed the trials under the act would generally be governed by the laws of the State, affording the party such a jury trial as pertained to the court before which he was tried, which is now secured by express statute.

·But in regard to the 22d section, for obvious reasons, no jury trial could be had. And in arguing that the constitution secured none, I did attempt to show, and convinced myself, at the time, that for all mere police regulations, and trials for violations of them, there was no indispensable necessity that the law should secure a jury trial, and that the state constitution, in securing a jury trial, had no reference to offences of that inferior grade. But still, as the general laws of the state do secure a kind of jury trial for all cases before a justice, I suppose, unless that is taken away in express terms, or by fair implication, as is the case of prosecutions under the 22d section, so far as the relator here was concerned, it will be accorded to all alike, whether accused of one offence, or another. But we did not suppose we were called upon to decide that point. I feel no disposition to explain or vindicate the decision farther. I ought to say, perhaps, that I have found no reason to doubt the perfect soundness of the above views.