*79 OPINION OF THE COURT
Albert Koch, J.
The defendant, Rigoberto Torres, was arrested on September 15, 1983, and charged with violating subdivision 2 (operating a vehicle with blood alcohol content of .10 or more), and subdivision 3 (operating a vehicle while under the influence of alcohol) of section 1192 of the Vehicle and Traffic Law. The arrest took place at a driving while intoxicated (DWI) safety check roadblock set up by the New York City Police at the westbound lanes of the 181st Street Bridge, which connects The Bronx to Manhattan.
The defendant moves to dismiss the charge based on the alleged unconstitutionality of the roadblock and also moves to suppress the breathalyzer test results as well as expected testimony relating to coordination tests administered to him as being obtained in violation of his rights under the State and Federal Constitutions (NY Const, art I, § 12; US Const, 4th Arndt). A hearing on this motion was held on March 8, 1984 and continued on March 12, 1984.
The facts are not in dispute. Special units of the New York Police Department, acting under administrative guidelines, routinely set up limited roadblocks on public highways for the purpose of apprehending intoxicated or impaired drivers. Uniformed police officers funnel all vehicles in one or more lanes of traffic to a compulsory stop point by the use of road markers and directions. These drivers are stopped without any previous indication of criminality or conduct violative of the Vehicle and Traffic Law.
After the initial stop, a police officer, without requesting the production of a driver’s license or valid registration, announces to each driver that a DWI safety check is being conducted. He then inquires as to how the driver feels. During this process, the officer monitors the appearance, responses and general condition of the driver. At this point in time most drivers are allowed to proceed on their way. Only those exhibiting any indicia of intoxication or impairment — i.e., bloodshot or watery eyes, slurred speech, the odor of alcohol on the breath — are directed to drive their cars to a “safety zone” a few feet away.
*80 Once in the “safety zone” the drivers are told to exit their vehicles and asked additional questions. They are then requested to submit to various field sobriety tests in an effort to allow the police officer to better ascertain the driver’s physical dexterity.
These drivers are not given any warnings concerning their right to refuse to take the dexterity tests, or the legal consequences of submitting to or refusing to take the tests. Nor are these drivers advised that any conclusions reached pursuant to the police officer’s observation of the tests may provide or supplement the basis for a determination by that officer that probable cause to arrest exists. Finally, there is a failure to inform the drivers that testimony as to these observations may, and in all probability will, be offered against them at a later date in a court of law.
The “formal” arrest, if necessary, takes place after the completion of the field sobriety test. This action finds its probable cause in the totality of circumstances observed by the officer with respect to the driver at both the initial stop and safety zone area. Miranda warnings are given at this time.
The driver/defendant is then taken to a highway unit precinct. He is advised of the procedures and ramifications involved in submitting to a breathalyzer test and offered the opportunity to voluntarily comply. If his consent is obtained, he is given a breathalyzer test as well as another more complete series of dexterity coordination tests. This process, with the exception of the actual taking of the breathalyzer test, is videotaped.
The court makes the following specific findings of fact pertaining to the defendant:
On September 15, 1983, a DWI roadblock, indicated by signs, was set up by a uniformed police unit at the westbound 181st Street Bridge. All vehicles proceeding through the roadblock were stopped. Each driver was then approached and asked how they felt.
The vehicle operated by the defendant was driven into this initial area in a normal manner and was stopped solely in accordance with the questioning procedure. Police Officer Hauschild, while asking, the defendant how he felt, *81 made several observations. He noticed that the defendant’s eyes were watery, his speech was slurred, and he had the odor of alcohol on his breath.
The defendant was then directed to drive his vehicle to the safety zone a few feet away. Police Officer Hauschild ordered the defendant out of his car and gave him a field sobriety test. Based on the defendant’s performance and his statement that he had consumed eight beers, the defendant was then placed under arrest and transported to a highway unit precinct. On the way to the precinct Police Officer Hauschild gave the defendant his Miranda warnings.
Upon arriving at the highway unit precinct, the defendant was again advised of his constitutional rights, whereupon he repeated his statements as to his alcohol consumption. He voluntarily consented to taking a breathalyzer test. The results indicated a reading of .12% blood alcohol.
The defendant now stands charged with violating subdivisions 2 and 3 of section 1192. He thus makes the instant motion.
The first issue to be decided is whether the constitutionál rights of motor vehicle drivers are violated by police stops at “Driving While Intoxicated Safety Check” roadblocks.
The initial stop of the defendant’s car sufficiently restrained his freedom to result in a seizure subject to constitutional limitations. (See Terry v Ohio, 392 US 1, 16.) At that time the police officers lacked any indication that a crime was committed or that any criminal activity was under way. Accordingly, the seizure cannot find its justification under either common-law principles or the Criminal Procedure Law. (See People v Cantor, 36 NY2d 106, 112; CPL 140.50.) Unless the initial stop was reasonable, the subsequent acquisition of observations and test results from the defendant would be suppressible as the derivative results of an illegal seizure. (Henry v United States, 361 US 98; Wong Sun v United States, 371 US 471.)
Reasonableness in this context requires the proper balancing between the privacy interests of the individual and the public interests of the State. The action of the police must be justified at its inception and be a reasonable *82 response to the problem which it addresses. (Terry v Ohio, supra, at p 19; Cupp v Murphy, 412 US 291; People v Kuhn, 33 NY2d 203.)
The State’s compelling interest in highway safety permits distinctions between the privacy rights of citizens based upon whether or not they are occupants of motor vehicles. (United States v Martinez-Fuerte, 428 US 543.)
No New York appellate authority has directly passed upon the constitutionality of driving while intoxicated (DWI) roadblock stops but ample Federal and State court authority exists regulating various types of motor vehicle stoppages.
Brief stops of motorists at permanent checkpoints to enable Federal officers to look for illegal aliens was upheld because it balanced a limited stop at a permanent checkpoint with extensive prior warnings against the exigency of a massive influx of illegal noncitizens. (United States v Martinez-Fuerte, 428 US 543, supra.)
Random stops, arbitrary in nature, to check a driver’s license and registration have been held unconstitutional. (.Delaware v Prouse, 440 US 648.) That same case, however, allowed fixed checkpoints for this purpose. Justice White stated there that: “For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. ‘At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers’ authority, and he is much less likely to be frightened or annoyed by the intrusion.’ ” (Supra, at p 657; emphasis added.)
Under the right circumstances, the roadblock need not be permanent or have lights or warnings but may occur in isolated areas and be a roving roadblock. (People v John BB., 56 NY2d 482.) Routine “traffic checks” by police officers to determine whether or not a vehicle is being operated in compliance with the Vehicle and Traffic Law is *83 permissible when conducted in a nonarbitrary, nondiscriminatory uniform manner. (People v Ingle, 36 NY2d 413, 415; People v Sobotker, 43 NY2d 559, 563; People v Mestey, 61 AD2d 447, 450.)
Thus, police officers, on whim or caprice and without an articulable suspicion or probable cause, may not stop the driver of a single motor vehicle. They may properly stop one or more lanes of traffic temporarily, at á roadblock in a nonarbitrary manner when a discernible need is established.
A routine stop to establish compliance with Vehicle and Traffic Law regulations pertaining to licensing and registration has been sanctioned as a proper exercise of police power. The same authorized minimal intrusion to establish compliance with Vehicle and Traffic Law regulations as to licensing and registration occurs when a DWI stop takes place. In the latter situation the danger to be prevented and the lifesaving aspects to the drivers and other citizenry leave no question as to the needs outweighing the inconvenience and render the intrusion totally reasonable. (People v Peil, 122 Misc 2d 617.)
Here the State is not following an “end justifying the means” theory but rather a proper exercise of its inherent power to limit in a very minor way the mobility of some of its citizens to save the lives and property of these same citizens and others (People v Scott, 122 MisC 2d 731; State v Deskins,_Kan_, 34 Crim L 2232).
Accordingly, the initial stop of the defendant was constitutional and the motion by defendant to dismiss the information on those grounds is denied.
The next issue before this court is the effect of the field sobriety test taken by the defendant in the safety zone.
At that point the police officer had gone beyond the minimum threshold of routine questioning. He had instructed the defendant to position his vehicle in an area under police authority. Under all the attendant circumstances, the defendant could reasonably infer that he was in custody (People v Yukl, 25 NY2d 585, 589), and had indeed been seized within the meaning of the Fourth Amendment (People v Cantor, 36 NY2d 106, 111, supra; Terry v Ohio, 392 US 1, supra).
*84 Placing the driver/defendant in custody triggered certain constitutional requirements. The Miranda case and its progeny are concerned solely with verbal statements made by a defendant in custody. The warnings necessary in the case of a field sobriety test are of a slightly different nature.
The field sobriety test presents a hybrid situation. The defendant is in custody and his taking of the test is the result of an “interrogation.” The results of the test are as damning as a verbal admission. The defendant must be warned that anything he says or does may formulate the basis for his arrest or be used against him in a court of law. While the results of the various dexterity tests are, for the most part, conduct and not speech, it is conduct that speaks louder than words.
The officers must also inform the driver/defendant that he may legitimately refuse to submit to the test, and that his refusal will not be admissible against him in a court of law. It follows that where consent was obtained, the People have the heavy burden to prove that it was a voluntary and knowing consent. (Schneckloth v Bustamonte, 412 US 218.) The police officer, faced with a driver who refuses to take the field sobriety test, must base his determination as to the existence of probable cause to formally arrest the driver upon observations made up to that point.
Accordingly, the results of the field sobriety test are to be suppressed, and the motion made by the defendant to that end is granted.
As to the results of the dexterity tests performed at the precinct after the breathalyzer test, these are not suppressed. Any defect arising out of errors at the safety zone is attenuated. There was a clear break in any form of interrogation. Sufficient time had passed and sufficient warnings were given to justify the belief that the defendant had been returned to the status of one who was acting voluntarily after sufficient warning and was not under the undue influence of the police officer’s directions. (People v Chapple, 38 NY2d 112.)
The final issue before the court is that part of the defendant’s motion dealing with suppression of the results of the breathalyzer test.
*85 A breathalyzer machine determines the content of a person’s blood alcohol by analyzing the breath of the subject’s lower lungs. In simplistic terms, the individual’s breath is gathered in the machine and caused to pass through a solution which changes color in proportion to the amount of alcohol passing through it. From the degree of change in color the amount of alcohol which passed through the solution can be calculated, and the results recorded. (People v Richter, 102 Misc 2d 285, 287-288.)
There is no question that the breathalyzer test is a wholly constitutional method of determining whether there is alcohol in a defendant’s system, subsequent to an arrest for driving under the influence of alcohol.
The controlling statute (Vehicle and Traffic Law, § 1192, subd 2) clearly states that “[n]o person shall operate a motor vehicle while he has .10 of one per centum or more by weight of alcohol in his blood as shown by chemical analysis of his blood, breath, urine or saliva”. A finding that the accused has a blood alcohol content of .10% or more is per se evidence of guilt. (People v Molina, 121 Misc 2d 483, 491.)
In most cases involving the prosecution of a defendant for driving while intoxicated or impaired, the only tangible evidence offered against him is the result of the breathalyzer test. As such, it can be considered material evidence {People v Hitch, 12 Cal 3d 641). Is there a duty to preserve such evidence? It has been held that the purpose of this duty (to preserve) is not simply to correct an imbalance of advantage, whereby the prosecution may surprise the defense at trial with new evidence, rather, it is also to make the trial a search for the truth informed by all relevant material, much of which, because of an imbalance in investigative resources, will be exclusively in the hands of the government (People v Molina, 121 Misc 2d 483, 488, supra, citing United States v Bryant, 439 F2d 642, 648).
The issue of preservation of the breathalyzer ampoules had been a popular subject of litigation as of recent times. In People v Le Pree (105 Misc 2d 1066), the court found that subsequent retesting or chemical analysis of the original ampoule, no matter how preserved, provides no acceptable scientific relationship to the accuracy or validity of the *86 original test results. Similarly, the court in People v Rich (118 Misc 2d 1057), concluded that preservation of the original ampoule was not mandated by the United States Constitution, since due process requires only the disclosure of preexisting exculpatory evidence, and the defendant’s mere allegation that this evidence may be exculpatory does not necessarily establish this fact.
In contrast, various courts have determined that although retesting of the original ampoule has not attained wide acceptance in the scientific community (except to discover gross defects — imperfections in the glass ampoule, defective fluid composition), a second sample must be taken at the same time as the original and preserved for the defendant’s independent testing (People v Molina, supra; People v Richter, supra; People v Shepherd, 118 Misc 2d 365; People v Darbouze, 122 Misc 2d 654).
While the process of preserving a second sample is within the means of the police department, and permits preservation of the sample for at least 12 months (People v Richter, supra; People v McCabe, unreported decision, Erie County), their failure to do so goes more to the weight of the test evidence being offered than to its admissibility and provides no constitutional impediment. In California v Trombetta (467 US_), the Supreme Court of the United States put to rest any residual doubts as the necessity of the People to either preserve the original ampoule or breath sample or to produce and preserve a second ampoule or breath sample for the defense.
Accordingly, in the opinion of this court, the results of the breathalyzer test are not suppressed.