## State of Vermont v. Steven Record

[548 A.2d 422]

No. 86-041

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes,[1] JJ.**

Opinion Filed June 10, 1988

*Shelley A. Hill, Windsor County Deputy State's Attorney,* White River Junction, for Plaintiff-Appellee.

*Frederick M. Glover* of *Law Offices of F.J. Glover, P.C.,* Ludlow, for Defendant-Appellant.

**Peck, J.** This is an interlocutory appeal from a denial of defendant's pretrial motion to suppress all evidence of intoxication obtained at a motor vehicle roadblock checkpoint in Springfield, Vermont. The roadblock was established by the Springfield Police Department during the evening of July 18, 1985. The sole question presented for our consideration is whether Chapter I, Article Eleven of the Vermont Constitution was violated by the warrantless stop at the checkpoint which had been established for the purpose of detecting and deterring drivers operating under the influence of intoxicating liquor (DUI). We hold that under the facts of this case the district court's ruling denying the motion to suppress was proper; accordingly, we affirm.

On July 18, 1985, the Springfield Police Department established a roadblock in connection with project S.T.A.R.T. (Stop Threats of Alcohol Related Tragedies). It was designed and con-

---

[1] Justice Hayes was present at oral argument but did not participate in the decision.

ducted pursuant to policy guidelines to curb officer discretion, ensure public safety, and minimize the length and degree of intrusion in accordance with this Court's directive in *State* v. *Martin*, 145 Vt. 562, 571, 496 A.2d 442, 448 (1985).

Defendant concedes that, given the facts here, the stop at issue is constitutional under this Court's interpretation of the Fourth Amendment to the United States Constitution. See *id.* at 568, 496 A.2d at 446. He contends, however, that Chapter I, Article Eleven of the Vermont Constitution affords individuals more protection than its federal counterpart, and urges us to hold sobriety checkpoints unconstitutional under the Vermont Constitution. Defendant's argument can be simply stated. He contends that in the absence of particularized suspicion, warrantless searches are proscribed by Article Eleven unless such searches can be characterized as the least intrusive means of advancing a compelling state interest.

The defendant first points to the language of the Vermont Constitution. He notes that while the Fourth Amendment of the United States Constitution prohibits "unreasonable" searches and seizures without a warrant, the word "unreasonable" does not appear in Article Eleven, which reads in part: "[T]he people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure . . . ." Vt. Const. ch. 1, art. 11.

Regardless of this difference, this Court has held that the word "unreasonable" is as implicit in Article Eleven as it is express in the Fourth Amendment. In an early case, *Lincoln* v. *Smith*, 27 Vt. 328, 346 (1855), this Court stated: "the construction of the eleventh article of our bill of rights is to secure only against *unreasonable* searches and seizures . . . ." (emphasis added); we recently approved this interpretation in *State* v. *Badger*, 141 Vt. 430, 454, 450 A.2d 336, 350 (1982). Therefore, Article Eleven does not mandate an absolute prohibition against searches and seizures undertaken without a proper warrant.

The primary evil sought to be avoided by Article Eleven was the issuance and enforcement of general warrants. See *Lincoln*, 27 Vt. at 346; E. Fisher, Search and Seizure 627 (1970). Defendant contends that roadblock checkpoints exhibit many of the same characteristics as general warrants, and are therefore prohibited. As Justice Bennett explained in *Lincoln*, the general warrant was abhorrent "because it was not fit that it should be left to the officer to judge of the ground of suspicion; but that this belonged to

the magistrate . . . ." *Lincoln*, 27 Vt. at 350. In this case, the police conducted the roadblocks pursuant to written, objective police policies based on clear judicial guidelines which effectively circumscribed officer discretion, and effectively avoided the evil sought to be prevented by the prohibition of general warrants.

Roadblocks, like general warrants, involve searches and seizures of individuals without particularized suspicion. Article Eleven generally requires particularized suspicion to justify a search or seizure of an individual; however, it has been historically recognized that use of generalized suspicion is sometimes justified. See *Lincoln*, 27 Vt. at 350.[2]

In the present case the seizures were justified. The sobriety checkpoint enabled the police to apprehend intoxicated drivers who may have otherwise posed a serious threat to society. In addition, the written police guidelines prevented arbitrary police conduct, and the scope of the roadblock was narrowly drawn. The police guidelines required that the police act with restraint, and the stop was carried out for the limited purpose of apprehending drunk drivers. See *Opinion of Justices*, 128 N.H. 14, 16-17, 509 A.2d 744, 745-46 (1986) (checkpoints constitutional under state constitution); *State* v. *Kirk*, 202 N.J. Super. 28, 56-58, 493 A.2d 1271, 1287-88 (1985) (roadblocks may be constitutional under New Jersey Constitution if properly done).

Article Eleven of the Vermont Constitution is similar in purpose and effect to the Fourth Amendment of the United States Constitution. However, this Court, as the final arbiter of this state's constitution, is free "to interpret the precise meaning of our own constitutional equivalent so long as no federal proscriptions are transgressed." *In re E.T.C.*, 141 Vt. 375, 378, 449 A.2d 937, 939 (1982). While the balancing test employed under the Fourth Amendment is not compelled by the language of Article Eleven, in view of Article One it is nevertheless in keeping with its spirit.

The language of Article Eleven seems to prohibit unequivocally warrantless searches and seizures; however, Article One sets forth the principle that all persons have the right to enjoy "certain natural, inherent, and unalienable rights, amongst which are the en-

---

[2] In *Lincoln* Justice Bennett notes that "there are many cases where the law making power has given the right to apprehend, under general warrants; as in the case of loose, idle and disorderly persons . . . ." 27 Vt. at 350.

joying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety . . . ." Vt. Const. ch. I, art. 1. We recognize that in order to preserve Article One interests the government may properly exercise its " 'inherent power to limit in a very minor way the mobility of some of its citizens.' " See *State* v. *Alexander*, 22 Ohio Misc. 2d 34, 40, 489 N.E.2d 1093, 1097 (1985) (quoting *People* v. *Torres*, 125 Misc. 2d 78, 478 N.Y.S.2d 771, 775 (Crim. Ct. 1984)). In the past, this Court has balanced and limited the Article Eleven interest to be free from warrantless arrest where the public welfare is at stake. See *In re Powers*, 25 Vt. 261, 266 (1853) (Article Eleven "has never been supposed to prohibit arrests by private persons, or without warrant, in that class of cases where delay would be perilous.").

Under the Fourth Amendment, the constitutionality of a DUI roadblock will "depend upon the reasonableness of the seizure, determined by weighing the public interest in the seizure against the degree of intrusion into personal privacy occasioned by the particular DUI roadblock." *Martin*, 145 Vt. at 568, 496 A.2d at 446. The reasonableness of the seizure depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brown* v. *Texas*, 443 U.S. 47, 50 (1979). The factors to be weighed in determining constitutionality of roadblocks include the public interest in the roadblock as a safety measure that immediately removes intoxicated drivers from the public highway and deters other irresponsible individuals from driving after drinking, the degree to which the stop at any given DUI roadblock intrudes upon an individual's legitimate and reasonable expectation of privacy, and the extent of the interference with an individual's personal liberty. *Martin*, 145 Vt. at 569-70, 496 A.2d at 447; see *Brown*, 443 U.S. at 50-51.

Unlike most warrantless "seizures," proper or otherwise, those made at DUI checkpoints are usually undertaken without even a suspicion of criminality in the minds of the officers against most of the motor vehicle operators approaching the checkpoint. This circumstance alone requires that carefully drawn guidelines be promulgated and enforced by the courts to insure that the right to use DUI checkpoints is not subject to abuse. We are, after all, balancing an important private right guaranteed by both the United States and the Vermont Constitutions, against the safety

and welfare of the people who use the highways. We believe the criteria established by this Court in *Martin* satisfy the balancing test when applied to DUI roadblocks under Article Eleven. As a general rule a roadblock will pass constitutional muster if:

> (1) the initial stop and the contact between the officers in the field and the motorist involves an explanation of the nature of the roadblock and minimal detention of a nonimpaired driver; (2) the discretion of the officers in the field, as to the method to be utilized in selecting vehicles to be stopped, is carefully circumscribed by clear objective guidelines established by a high level administrative official; (3) the guidelines are followed in the operation of the roadblock; (4) approaching drivers are given adequate warning that there is a roadblock ahead; (5) the likelihood of apprehension, fear or surprise is dispelled by a visible display of legitimate police authority at the roadblock; and (6) vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons.

*Martin,* 145 Vt. at 571, 496 A.2d at 448.

Defendant argues that the DUI roadblock is not constitutional under Article Eleven because it is more intrusive than other traditional methods of detecting intoxicated drivers. Under the least restrictive analysis, the State would have the burden to show that the roadblocks were more successful at determining and apprehending drunk drivers than less restrictive methods such as roving patrols. *State* v. *Langevin,* No. 4510-12-85CnCr (Vt. Dist. Ct. March 5, 1986), *appeal docketed,* No. 86-242 (Vt. April 10, 1986). See *State* v. *Badger,* 141 Vt. at 454, 450 A.2d at 350.

We reject defendant's argument that the "least intrusive rule" should control the decision in this type of case. This Court has already acknowledged the effectiveness of roadblocks as deterrents for those who might otherwise decide to drink and drive. *Martin,* 145 Vt. at 569-70, 496 A.2d at 447. The California Supreme Court recently upheld the constitutionality of roadblock sobriety checkpoints under the United States and California Constitutions. *Ingersoll* v. *Palmer,* 43 Cal. 3d 1321, 743 P.2d 1299, 241 Cal. Rptr. 42 (1987). That court applied a balancing test. It declined to adopt the least intrusive standard and questioned seriously the effectiveness of roving police patrols against the con-

tinuing scourge of drunk drivers, and stressed the superior deterrent value of checkpoints. *Id.* at 1338-41, 743 P.2d at 1311-13, 241 Cal. Rptr. at 54-56.

A stop based on reasonable suspicion requires a purely fortuitous coinciding of circumstances: the presence of a patrolling officer at a particular place, at a particular time and a vehicle appearing at the same place and time, operated by a person "under the influence," who is driving in such a fashion as to create a reasonable suspicion that he is operating in violation of the DUI laws. The fact that each of these elements must meet in combination to justify the routine patrol stop makes it unlikely, in our view, that reliance thereon produces better or even equal results over the same period of time. Moreover, general public awareness that checkpoints may be established serves to enhance their deterrent value over that of patrols. See *id.* at 1346-47, 743 P.2d at 1316-17, 241 Cal. Rptr. at 60.

We acknowledge that the use of a balancing analysis to uphold the constitutionality of a roadblock seizure carries with it the dangerous potential for further extension of this type of intrusion upon the rights of citizens to travel unimpeded. As a New Jersey court noted:

> The thought that an American can be compelled to "show his papers" before exercising his right to walk the streets, drive the highways or board the trains is repugnant to American institutions and ideals. . . . [O]ur system is based on the idea that the risk of criminal activity is less of a danger than the risk of unfettered interference with personal liberty.

*State* v. *Kirk*, 202 N.J. Super. at 52, 493 A.2d at 1285. Nevertheless, the New Jersey court noted the serious threat posed to public safety by drunk driving, and held that "a DUI road block is constitutional if properly conducted." *Id.* at 43, 493 A.2d at 1279 (quoting 3 W. LaFave, Search and Seizure § 10.8(g), at 190 (Supp. 1985)).

We recognize the compelling need to curb the threat posed to public safety by the frequency with which individuals drive while intoxicated. Although "[t]he slaughter on the highways of this Nation exceeds the death toll of all our wars," *Perez* v. *Campbell*, 402 U.S. 637, 657 (1971) (Blackmun, J., concurring), "only one out of every 2000 drinking drivers is apprehended." 3 W. LaFave,

Search and Seizure § 10.8(g), at 207 (Supp. 1985). In the light of these statistics, we hold that, in the proper circumstances, a DUI roadblock may be justified under the Vermont Constitution. Where the roadblock is carried out pursuant to written guidelines designed to comply with this decision, the DUI roadblock will be justified. See also *Commonwealth* v. *Tarbert*, 517 Pa. 277, 289-93, 535 A.2d 1035, 1041-43 (1987); *Little* v. *State*, 300 Md. 485, 508, 479 A.2d 903, 913 (1984) (DWI roadblock is constitutional under state constitution where guidelines are followed); *Commonwealth* v. *Trumble*, 396 Mass. 81, 483 N.E.2d 1102 (1985) (same).

In summary, precedential decisions such as *Badger* and *Lincoln* have determined that the word "unreasonable," in the context in which it appears in the Fourth Amendment to the United States Constitution, is implicit in Chapter I, Article Eleven of the Vermont Constitution in the same context. That being so, we are led to the inevitable conclusion that *Martin* controls and is dispositive of this case. To hold otherwise would effectively overrule *Martin*; we decline to do so.

We have examined the trial court's findings and conclude that they are sufficient to support a conclusion of constitutionality in the light of the balancing test and the guidelines established in *Martin*. We reaffirm those guidelines and hold they are applicable in resolving challenges to the constitutionality of DUI roadblocks under Chapter I, Article Eleven of the Vermont Constitution.

*Affirmed and remanded.*

**Hill, J.,** dissenting. One of the great strengths of the Vermont and United States Constitutions is that they protect certain basic individual rights that other societies and cultures, now or at other times in history, might find extravagant or excessive. It is indicative of the importance attached to these rights that the framers of the two constitutions saw fit to give them the status of constitutional rights, so that they could not be abrogated or modified by the legislature as an expedient solution to the major social problems of any particular time or era. The decision in this case permits a substantial encroachment, without adequately demonstrable justification, on the right to be free from search or seizure as an expedient solution to one of the major social problems of our time: drunk driving. Because this result debases the constitu-

tional right to be free from search or seizure, I respectfully dissent.

## I.

Since the defendant has conceded that the roadblock stop in question was constitutionally permissible under the Fourth Amendment standards established by this Court in *State* v. *Martin*, 145 Vt. 562, 571, 496 A.2d 442, 448 (1985), the majority correctly notes that the only issue is whether Chapter I, Article Eleven of the Vermont Constitution provides greater rights to an individual in a DUI roadblock situation than does the Fourth Amendment. The majority concludes, without any discernable rationale other than the bold and unsupported assertion that the *Martin* standards adequately "balance" the competing interests, that the constitutionality of a DUI roadblock under Article Eleven is governed by the Fourth Amendment standards established in *Martin*. For the reasons that follow, I cannot join the majority's decision to adopt, as a matter of state constitutional law, the federal doctrine on this question.

First, as this Court noted in *State* v. *Badger*, 141 Vt. 430, 448-49, 450 A.2d 336, 347 (1982), the Vermont Constitution predates the federal constitution, and it is this Court's duty to enforce the Vermont Constitution as it is the fundamental charter of our state. Second, Article Eleven sets forth the right to be free from search and seizure in absolute terms,[1] whereas the Fourth Amendment guarantees the right to be free from "unreasonable" searches and seizures.[2] Article Eleven was enacted with its abso-

---

[1] Article Eleven provides:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

Vt. Const. ch. I, art. 11.

[2] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath

lute language in 1777, but the phrase "unreasonable searches" did not appear in any American constitution until 1780 with the adoption of the Massachusetts Declaration of Rights, which served as the model of the Fourth Amendment, ratified in 1791. J. Landynski, *Search and Seizure and the Supreme Court* 38 (1966). Furthermore, Article Eleven's language has remained absolute since its original adoption, whereas the model for the Vermont charter, the Pennsylvania Declaration of Rights, see E. Conant, *Geography, History and Civil Government of Vermont* 115 (1890), was amended in 1790 to prohibit only "unreasonable searches and seizures."[3] Thus, the history of the adoption of contemporaneous colonial constitutions and later the Fourth Amendment suggests that the omission of the word "unreasonable" from Article Eleven was intended to have some substantial constitutional significance, or at the very least, that Article Eleven was not specifically intended to mean the same thing as the Fourth Amendment.

Given the historical and substantive textual differences between Article Eleven and the Fourth Amendment, it is this Court's constitutional duty to examine whether in this case the independent authority of the Vermont Constitution provides greater protection than its federal counterpart. *State v. Jewett*, 146 Vt. 221, 229, 500 A.2d 233, 238 (1985). It is true that the Vermont and federal constitutions "have a common origin and a similar purpose." See *State v. Brean*, 136 Vt. 147, 151, 385 A.2d 1085, 1088 (1978). Nevertheless, if the federal doctrine applicable in this case is not responsive to the historic purpose of and policies underlying Article Eleven, then it would be an abdication of our constitutional duty to follow blindly the federal courts in the interest of uniformity. See *State v. Wood*, 148 Vt. 479, 482, 536 A.2d 902, 904 (1987); Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 502 (1977).

The majority adopts the *Martin* standards for purposes of Article Eleven without any analysis of the basis of the *Martin* decision. Clearly, in order to determine whether federal doctrine in this area, as represented by *Martin*, is consistent with Article

----

or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[3] See Pa. Const. art. 1, § 8.

Eleven's command, it is necessary to first examine the constitutional underpinnings of the *Martin* decision.

## II. *Fourth Amendment Protection From DUI Roadblocks Under Martin*

The United States Supreme Court has never directly addressed the constitutionality of sobriety checkpoints. Nevertheless, its decisions in several closely related cases have indicated strongly that such seizures would be permissible under the Fourth Amendment, leading some state courts to uphold sobriety checkpoints on that constitutional ground. See, e.g., *People* v. *Bartley*, 109 Ill. 2d 273, 292-93, 486 N.E.2d 880, 883 (1985); *State* v. *Deskins*, 234 Kan. 529, 542, 673 P.2d 1174, 1185 (1983); *Little* v. *State*, 300 Md. 485, 504, 479 A.2d 903, 912 (1984); *State* v. *Coccomo*, 177 N.J. Super. 575, 584, 427 A.2d 131, 135 (1980); *People* v. *Scott*, 63 N.Y.2d 518, 529, 473 N.E.2d 1, 6, 483 N.Y.S.2d 649, 654 (1984). But see *State ex rel. Ekstrom* v. *Justice Court of State*, 136 Ariz. 1, 5, 663 P.2d 992, 996 (1983); *State* v. *Smith*, 674 P.2d 562, 564 (Okla. Crim. App. 1984); *State* v. *Olgaard*, 248 N.W.2d 392, 395 (S.D. 1976).

In *Martin*, this Court adopted the position of those state courts which had held that DUI roadblocks are not per se unreasonable under the Fourth Amendment. *Martin*, 145 Vt. at 567, 496 A.2d at 446. The Court stated in *Martin* that "the constitutionality of a DUI roadblock under the Fourth Amendment will depend upon the reasonableness of the seizure, determined by weighing the public interest in the seizure against the degree of intrusion into personal privacy occasioned by the particular DUI roadblock." *Id.* at 568, 496 A.2d at 446. After recognizing the substantial public interest in the control of drunk driving, the Court reasoned that since "the nature of the public interest to be served by a DUI roadblock is unlikely to vary substantially from case to case," the reasonableness of such a seizure will generally turn on the degree of intrusion caused by the seizure. *Id.* at 570, 496 A.2d at 448. Since the degree of intrusion is directly related to the procedural characteristics of a particular DUI roadblock, the reasonableness of the roadblock turns essentially on the adequacy of procedural

limitations imposed on officer discretion in the operation of the roadblock.[4]

Under the Fourth Amendment analysis applied in *Martin*, therefore, the constitutionality of a sobriety checkpoint depends on a balancing of public against private interests; a balance which is implemented by an analysis of the extent to which a particular roadblock meets the generalized criteria of a "reasonable" road-block set forth in *Martin*.[5] This Fourth Amendment test of reasonableness is dependent on and derives from two tenets of current Fourth Amendment jurisprudence that are, contrary to the majority's assumption, not necessarily consistent with Article Eleven: first, that a balancing test is an appropriate method of testing the constitutionality of a seizure that is less intrusive than a traditional arrest, and second, that neutral and objective limitations on police discretion in the conduct of the seizure, without more, can justify the intrusion caused by the seizure. These tenets are the product of a succession of cases decided over the last three decades that reached a salient point with *Brown* v. *Texas*, 443 U.S. 47 (1979).

---

[4] While we declined in *Martin* to establish a hard and fast rule, we did recognize that "[a]s a general rule, a DUI roadblock will pass constitutional muster if: (1) the initial stop and the contact between the officers in the field and the motorist involves an explanation of the nature of the roadblock and minimal detention of a nonimpaired driver; (2) the discretion of the officers in the field, as to the method to be utilized in selecting vehicles to be stopped, is carefully circumscribed by clear objective guidelines established by a high level administrative official; (3) the guidelines are followed in the operation of the roadblock; (4) approaching drivers are given adequate warning that there is a roadblock ahead; (5) the likelihood of apprehension, fear or surprise is dispelled by a visible display of legitimate police authority at the roadblock; and (6) vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons." *Martin*, 145 Vt. at 571, 496 A.2d at 448 (footnote omitted).

Since each of the criteria is directed toward limiting the intrusiveness of the stop by placing procedural limitations on the operation of the stop, the reasonableness of the seizure under this analysis turns primarily on the adequacy of these limitations.

[5] Like this Court in *Martin*, most courts addressing the constitutionality of sobriety checkpoints under the Fourth Amendment have focused on the procedural limitations on the scope of the stop as the central consideration. See Jacobs & Strossen, *Mass Investigations Without Individualized Suspicion: A Constitutional and Policy Critique of Drunk Driving Roadblocks*, 18 U.C. Davis L. Rev. 595, 598 n.8 (listing cases focusing on procedural safeguards).

In *Brown*[6], the Court stated that "[t]he reasonableness of seizures that are less intrusive than a traditional arrest depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' "[7] *Id.* at 50 (citations omitted) (quoting *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). A necessary corollary to this principle, of course, is that all intrusions on Fourth Amendment rights that are less intrusive than a traditional arrest are not subject to the traditional[8] warrant and probable cause requirements of the Fourth Amendment. The less demanding and more fluid test of general reasonableness, implemented by a balancing of competing interests, is applied, according to *Brown*, pri-

---

[6] *Brown* involved a stop and questioning of a pedestrian by police officers without a warrant or reasonable suspicion that the pedestrian was involved in criminal conduct. *Brown*, 443 U.S. 47, 51-52 (1979). Thus, although not a roadblock case, it involved the same type or class of seizure involved in a sobriety checkpoint case.

[7] The genesis of this doctrine is directly traceable to the landmark decision in *Terry* v. *Ohio*, 392 U.S. 1 (1968), where the Court created for the first time a limited exception to the warrant and probable cause requirement applicable to Fourth Amendment seizures by upholding a limited stop and frisk of a pedestrian on the basis of articulable suspicion that the person searched has committed or is about to commit a crime. The *Terry* Court held that because of the limited nature and purpose of this type of stop, its constitutionality should be tested against the Fourth Amendment's general proscription against unreasonable searches and seizures, rather than the traditional warrant and probable cause requirement. According to *Terry*, furthermore, the test of reasonableness is implemented by balancing the need to search against the invasion which the search entails. *Id.* at 21-22.

[8] Following *Terry*, the Supreme Court has consistently expanded the narrow exception originally created by applying a balancing test as a means of evaluating the reasonableness of a seizure, as opposed to the traditional warrant and probable cause requirement, to a broad variety of searches and seizures that are less intrusive than a traditional arrest. See, e.g., *Michigan* v. *Long*, 463 U.S. 1032 (1983) (search of car incident to highway stop); *Florida* v. *Royer*, 460 U.S. 491 (1983) (airport search for suspected drug trafficking); *Michigan* v. *Summers*, 452 U.S. 692 (1981) (detention of occupant of home while search warrant for house obtained); *United States* v. *Brignoni-Ponce*, 422 U.S. 873 (1975) (border search for illegal aliens). The broad application by the Court of this Fourth Amendment balancing test, in successive cases decided over a number of years, has apparently led the Court to the conclusion, expressly stated in *Brown*, 443 U.S. at 50, that a balancing test is now the rule, rather than an exception, with respect to that broad class of searches and seizures that are less intrusive than a traditional arrest.

marily because the intrusions involved are less severe than that associated with an arrest. *Brignoni-Ponce*, 422 U.S. at 880.

The second tenet of Fourth Amendment law established by *Brown* relates to the justification necessary to make a limited intrusion "reasonable." On this subject, the Court stated that:

> the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, *or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.*

*Brown*, 443 U.S. at 51 (emphasis added). On its face, this language suggests that these two types of justification are independently sufficient, and more significantly, that a seizure carried out pursuant to the type of plan described can be justified without more.

In *Martin*, our adherence to these principles was in accordance with our duty to follow and apply the Supreme Court's interpretation of the Fourth Amendment. In that case, it was not our role to examine whether the principles upon which the Fourth Amendment balancing test is based comport with this Court's view of the meaning of the Fourth Amendment. In this case, however, our task is different. In order to discharge its "duty to enforce the fundamental law of Vermont," *Badger*, 141 Vt. at 449, 450 A.2d at 347, this Court must analyze whether the *Martin* balancing test and its constitutional underpinnings are consistent with Article Eleven's command. The majority's failure to do so is the essential flaw of its analysis.

### III. *The Martin Test and Article Eleven*

In determining whether the *Martin* test is appropriate for assessing the constitutionality of sobriety checkpoints under Article Eleven, two important questions must be answered. First, does Article Eleven permit the application of a balancing test, as opposed to the traditional requirements of a warrant and probable cause, to assess the constitutionality of this type of "seizure?" Second, assuming such a seizure is permissible in the absence of a warrant or probable cause, what quantum of constitutional justifi-

cation is necessary to make such a seizure permissible under Article Eleven?

The majority opinion fails even to address these important questions. Instead, it conveniently glosses over them by asserting, without any real analysis, that the concept of "reasonableness" is implicit in Article Eleven, and therefore concluding that the constitutionality of DUI roadblocks under Article Eleven is controlled by *Martin*. If these questions are squarely addressed, I am led to the conclusion that the *Martin* standard, standing alone, does not square with Article Eleven's command.

## A.

The Court recently held in *State* v. *Jewett*, 148 Vt. 324, 328, 532 A.2d 958, 960 (1986), that Article Eleven, even though it does not contain the word "unreasonable," also "does not contemplate an absolute prohibition on warrantless searches or seizures." Nevertheless, the Court also concluded that "[t]he circumstances under which warrantless searches or seizures are permitted . . . must be jealously and carefully drawn." *Id.* (quotations omitted).

The question, then, is whether a DUI roadblock presents the sort of exceptional circumstances that, under *Jewett*, justify abandonment of the warrant and probable cause requirements. The majority's analysis fails to recognize that this is an important question because it assumes, without explaining why, that a balancing of competing interests is the applicable constitutional standard, rather than the warrant and probable cause requirements. By brushing aside this important analytic step, the majority tacitly approves the position that a balancing of competing interests analysis should be used to analyze the reasonableness of all searches and seizures that are less intrusive than a traditional arrest. See *Brown* v. *Texas*, 443 U.S. at 50-51. The danger with this position is that it transforms the balance of competing interests analysis from an exception into a rule of general applicability. See Wasserstrom, *The Incredible Shrinking Fourth Amendment*, 21 Am. Crim. L. Rev. 257, 264 (1984). This is a result that is, in my opinion, inconsistent with our holding in *Jewett*, and one that should not be reached without careful consideration and some explanation of how it can be reconciled.

My point is that the majority should recognize the significance of its action in applying a balancing of interests analysis in lieu of

the warrant and probable cause requirements. In most cases, the warrant and probable cause requirements of Article Eleven, as well as those of the Fourth Amendment, represent the Framers' best assessment of the appropriate balance of the competing interests. As stated by Mr. Justice Blackmun:

> While the Fourth Amendment speaks in terms of freedom from unreasonable seizures, the Amendment does not leave the reasonableness of most seizures to the judgment of courts or government officers: *The Framers of the Amendment balanced the interests involved and decided that a seizure is reasonable only if supported by a judicial warrant based on probable cause.*

*United States* v. *Place*, 462 U.S. 696, 722 (1983) (Blackmun, J., concurring in judgment) (emphasis added). In cases, such as this one, where a balance of interests analysis is applied, the objective constitutional standards embodied in the warrant and probable cause requirements are replaced by a subjective judicial judgment with respect to the appropriate balance between the competing interests. Because such a standard places so much power in the hands of judges and deviates so substantially from the traditional objective constitutional standard, it should only be applied in special cases involving exceptional circumstances. *Jewett*, 148 Vt. at 328, 532 A.2d at 960.

With this in mind, it is my judgment that, under Article Eleven, more must be shown to justify the abandonment of the warrant and probable cause requirements than a demonstration that the seizure in question is less intrusive than a traditional arrest. "Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impractical, is a court entitled to substitute its balancing of interests for that of the Framers." *New Jersey* v. *T. L. O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring); see also *Dunaway* v. *New York*, 442 U.S. 200, 212-14 (1979). In other words, the reasonableness of a seizure is to be evaluated by a balancing test only where the seizure is less intrusive than a traditional arrest *and* where "the practical realities of a particular situation suggest that a government official cannot obtain a warrant based upon probable cause without sacrificing the ultimate goals to which a search would contribute . . . ." *O'Connor* v. *Ortega*, 480 U.S. 709, 741, 107 S. Ct.

1492, 1511 (1987) (opinion of Blackmun, J., dissenting). See, e.g., *Brignoni-Ponce*, 422 U.S. at 881 (balancing test applied to border search because of minimal intrusion of stop and absence of any practical alternatives for policing the border); and *Terry* v. *Ohio*, 392 U.S. at 20-24 (balancing test applied to pat-down for weapons where brief intrusion necessary to protect officer safety).

If this analysis is applied to sobriety checkpoints, I agree with the conclusion of the majority that a sobriety checkpoint is in the narrow class of special cases where a balancing test is appropriate. As a general rule, brief stops at sobriety checkpoints are minimally intrusive. More importantly, the exigencies associated with the enforcement of DUI laws suggest that a balancing test is a more appropriate method of testing the constitutionality of a DUI stop than the warrant and probable cause requirement.

A warrant requirement is plainly impractical due to the mobility of suspected offenders. See *Carroll* v. *United States*, 267 U.S. 132, 153 (1925). Moreover, a probable cause requirement would force police into the situation of monitoring drivers suspected of driving while intoxicated until they have probable cause to arrest. Without an opportunity to speak to a driver, probable cause to arrest may never arise until after an accident has occurred. Given the danger to the driving public from intoxicated drivers, a probable cause test would potentially frustrate rather than promote the goal of detecting and removing drunk drivers from the road. Under these circumstances, Article Eleven permits this class of seizures to be tested by a balancing of competing interests.

### B.

Having determined that a balancing test is appropriate, the remaining question is the quantum of constitutional justification necessary to support a sobriety checkpoint seizure. The majority answers this question with the conclusory assertion that satisfaction of the *Martin* criteria also satisfies Article Eleven's demands, but the opinion fails to explain why. This flaw in the majority's analysis flows from its failure to recognize the significance of the fact that the seizure involved in this case, as with most seizures at DUI roadblocks, was undertaken without an iota of individualized suspicion that defendant had committed a crime.

This Court has recognized that, in cases involving warrantless seizures, the balance between an individual's Article Eleven rights

and the public interest is struck by requiring that an officer have a reasonable and articulable suspicion that a person has committed or is about to commit a crime. See *State* v. *Aldrich*, 122 Vt. 416, 423, 175 A.2d 803, 808 (1961) (under Article Eleven, the "[s]eizure of a motor vehicle on the public highway may be accomplished without a warrant only where the seizing officer has *reasonable cause for believing* that the automobile which he halts is illegally transporting contraband.") (emphasis added). Under *Martin*, however, a sobriety checkpoint is generally reasonable if conducted according to the criteria listed in the opinion; no degree of individualized suspicion is necessary to justify any particular stop. Under this analysis, the traditional justification for the infringement on personal liberty — individualized suspicion — is dispensed with in those cases where a seizure is minimally intrusive and neutral and where objective limitations are placed on officer discretion in the field.

In my view, the clear and absolute language of Article Eleven is a clear statement of the policy against unjustified searches and seizures as well as arbitrary ones. As Professor Amsterdam has noted:

> Indiscriminate searches or seizures might be thought to be bad for either or both of two reasons. The first is that they expose people and their possessions to interferences by government when there is no good reason to do so. The concern here is against *unjustified* searches and seizures: it rests upon the principle that every citizen is entitled to security of his person and property unless and until an adequate justification for disturbing that security is shown. The second is that indiscriminate searches and seizures are conducted at the discretion of executive officials, who may act despotically and capriciously in the exercise of the power to search and seize. This latter concern runs against *arbitrary* searches and seizures: it condemns the petty tyranny of unregulated rummagers.

Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 411 (1974). Written police guidelines aimed at curbing officer discretion, as mandated by *Martin*, may alleviate the problem of arbitrary police conduct, but sobriety checkpoints implicate Article Eleven's concern regarding justification as well. The majority offers no theory justifying such widespread suspi-

cionless seizures other than the public interest in combating the problem of DUI. But, as will be demonstrated, such an interest, in and of itself, has never justified abandonment of the fundamental requirement of individualized suspicion.

While I would not disagree with the statement in *Martin* that drunk driving is a serious threat to public safety giving rise to a strong state interest in curbing the practice, I cannot agree that the existence of this strong state interest, ipso facto, justifies abandonment of the requirement of individualized suspicion. As stated by Mr. Justice Stewart, in response to the argument that the problem of illegal immigration justified limited automobile stops some twenty-five miles from the United States' border in the absence of any individualized suspicion:

> It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.

*Almeida-Sanchez* v. *United States*, 413 U.S. 266, 273 (1973).

The tension involved in this case is little different from that described by Justice Stewart in *Almeida-Sanchez*. If all that is required to trigger the suspension of the individualized suspicion requirement is the existence of a serious law enforcement problem, then I fear that a police state is not far around the next corner. See *State* v. *Smith*, 674 P.2d at 564. As stated by one court:

> If roadblocks can be maintained to stop all persons, regardless of how innocent their conduct for the purpose of investigating or arresting drunk drivers, then presumably similar stops of all citizens could be undertaken for questioning and surveillance with regard to other crimes, such as possession of narcotics, possession of stolen property, or burglary. . . . Taking [such] an "end justifies the means" approach, would lose sight of a basic tenet of American jurisprudence — that the government cannot assume criminal

conduct in effectuating a stop such as the one in the instant case.

*Webb* v. *State*, 695 S.W.2d 676, 683 (Tex. Ct. App. 1985).

I would not go so far as to conclude that all searches or seizures not based on individualized suspicion are per se violative of Article Eleven.[9] Article Eleven, like the Fourth Amendment, must be flexible enough to accommodate very limited exceptions to rules of general applicability in particular cases where extraordinary private or public interests are involved, e.g., *Brignoni-Ponce*, 422 U.S. at 878-79 (need to police United States' borders against illegal alien influx), or where the practical realities of a situation make more flexibility essential. See, e.g., *Terry*, 392 U.S. at 23-24 (need of police officers to protect themselves in performance of their duties). Nevertheless, such exceptions must be carefully circumscribed to those situations where there is a demonstrable need for a particular type of suspicionless search, or seizure, as well as neutral and objective limitations, enforceable by the courts, on the exercise of the officer's discretion in the conduct of the search or seizure. In the context of a sobriety checkpoint, I would require the State to show that a properly conducted roadblock (according to the criteria outlined in *Martin*) would increase the effectiveness of DUI law enforcement to a significant degree.

Other state courts have applied precisely this sort of analysis to sobriety checkpoints. See *State* v. *McLaughlin*, 471 N.E.2d 1125, 1141 (Ind. Ct. App. 1984) (holding DUI roadblock unconstitutional, on Fourth Amendment grounds, because State failed to demonstrate that such seizures are "necessary, or at least more effective than available methods of drunk driving law enforcement, which are based on individualized suspicion aroused by observed conduct"); *State* v. *Koppel*, 127 N.H. 286, 291-92, 499 A.2d 977, 981 (1985) ("To justify the search or seizure of a motor vehicle, absent probable cause or even a reasonable suspicion that a criminal offense is being committed, the State must prove that its conduct significantly advances the public interest . . . [and that] no less intrusive means are available to accomplish the

---

[9] See *Dunaway* v. *New York*, 442 U.S. 200, 207-08 (1979) (The Fourth Amendment guarantee against unreasonable search and seizure has been traditionally analyzed in "terms of arrest, probable cause for arrest, and warrants based on such probable cause.").

State's goal."); *Webb* v. *State*, 695 S.W.2d at 681-82 (holding DUI roadblock unconstitutional on ground that "State failed in its burden of establishing the superiority of the . . . roadblock in light of available less intrusive alternative means of deterrence."); see also *Commonwealth* v. *Trumble*, 396 Mass. 81, 98, 483 N.E.2d 1102, 1112 (1985) (Lynch, J., dissenting) ("If such an intrusion [caused by a roadblock] can ever be said to be reasonable in a constitutional sense, it can only be after the Commonwealth has met its burden of showing that '[s]uch a procedure [achieves] a degree of law enforcement and highway safety that is not reasonably attainable by less intrusive means.'") (citation omitted).

Moreover, this approach is implicit in the better-reasoned Supreme Court decisions in this area. In *Delaware* v. *Prouse*, 440 U.S. 648 (1979), the Court struck down random drivers license checks by reasoning that "[g]iven the alternative mechanisms available, both those in use and those that might be adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment." *Id.* at 659. In *United States* v. *Martinez-Fuerte*, 428 U.S. 543 (1976), the decision to uphold suspicionless border stops at fixed checkpoints was based in large part on the rationale that illegal alien traffic could not be controlled in a less intrusive yet equally effective manner. *Id.* at 556-57. Similarly, the decision in *Brignoni-Ponce* to uphold random border stops on the basis of reasonable suspicion expressly relied on the "absence of practical alternatives for policing the border." *Brignoni-Ponce*, 422 U.S. at 881.

The majority glosses over the fact that the seizure involved in this case was conducted without a warrant, probable cause, or any suspicion whatsoever that the defendant had violated the law. While I might accept the proposition that such seizures are permissible in extraordinary cases where they are justified, e.g., *State* v. *Silvernail*, 25 Wash. App. 185, 188, 605 P.2d 1279, 1282-83 (1980) (roadblock and search for suspects departing ferry without individualized suspicion reasonable where serious felony had been committed),[10] I cannot conclude that DUI roadblocks in general

---

[10] "Before government officials can embark on a search or seizure for evidence to be used for this purpose [roadblock to gather evidence for criminal prosecution], they must have individualized suspicion of wrongdoing." *State* v. *Boyanovsky*, 30 Or. 131, 133, 743 P.2d 711, 712 (1987).

are justified unless the State can show that they are substantially more effective than available methods of enforcing the DUI laws.

## IV.

Sobriety checkpoints are a more intrusive method of enforcing the DUI laws than traditional roving patrol stops: such checkpoints involve the stopping of every passing motorist, and they are not based on individualized suspicion. Therefore, the State can only carry its burden of justification by demonstrating that sobriety checkpoints are a substantially more effective means of enforcing DUI laws than less intrusive, and therefore preferred, stops based on reasonable suspicion. See *Koppel*, 127 N.H. at 291-92, 499 A.2d at 981.

This Court recognized in *Martin* the general effectiveness of sobriety checkpoints in enforcing DUI laws, in terms of their utility in both detecting and deterring drunk driving. Nevertheless, whether sobriety checkpoints have some effectiveness in enforcing DUI laws is not the point; the question is whether the marginal contribution to highway safety from sobriety checkpoints justifies the greater intrusion they impose on Article Eleven rights than existing methods of enforcement. Here, the trial court found that of eighteen persons stopped at the roadblock, two were processed for DUI. There was absolutely no evidence presented by the State, however, of the superiority of the roadblock method of identifying and apprehending drunk drivers, or of the inadequacy of the traditional method of enforcing DUI laws. In short, there is no way the majority can determine, on the basis of this record, whether sobriety checkpoints are a more effective means of detection, thereby justifying the increased intrusion they entail. The majority's conclusion regarding the effectiveness of the roadblock challenged in this case is nothing more than an intuitive judgment, lacking any empirical support, which it endows with apparent legal authority by labelling it a conclusion of law.

The majority does correctly note that, aside from their effectiveness in apprehending drunk drivers, sobriety checkpoints have been viewed as contributing to the overall effectiveness of DUI law enforcement through their deterrent effect. See *People* v. *Bartley*, 109 Ill. 2d at 287, 486 N.E.2d at 886; *People* v. *Scott*, 63 N.Y.2d at 526-27, 473 N.E.2d at 4-5, 483 N.Y.S.2d at 652-53. The theory is that those who are drinking away from home are

more likely to moderate their liquor consumption if they respect the possibility of encountering a roadblock on the way home. A necessary corollary to this theory is that potential drunk drivers must have advance notice of the possibility of encountering such a roadblock if they are to be deterred.[11]

In this case, however, there was no advance publicity of the possibility of sobriety checkpoints. Furthermore, there was no evidence introduced that a highly publicized program of sobriety checkpoints would be a greater deterrent than a highly publicized program of highly visible police patrols. "To justify the greater intrusiveness of roadblocks, the State would have to prove that they had a substantially greater deterrent value than such a program." *Koppel*, 127 N.H. at 293, 499 A.2d at 982. No such showing has been made here.

I cannot help but observe in conclusion that the majority seems to have lost sight of the fact that the Framers of Article Eleven recognized that the blessings of freedom cannot be secured without a price. The effect of the majority's decision today is to sacrifice the Article Eleven rights of all those innocent drivers who must be stopped at a DUI roadblock for the sake of, what is at best, a speculative possibility that more DUI offenders will be apprehended or deterred from driving under the influence. No one questions that drunk driving is a serious problem in this country, posing a real risk to the driving public. But without any evidence that DUI roadblocks contribute in a demonstrable fashion to the lessening of that risk, there is no justification for the mass infringement on Article Eleven rights. Even if DUI roadblocks are conducted in a uniform and "non-arbitrary" manner, they are inconsistent with the constitutional and political tradition underlying Article Eleven. See *Olmstead* v. *United States*, 277 U.S. 438,

---

[11] Instructive on this point is the analysis of Mr. Justice Jackson in *Brinegar* v. *United States*, 338 U.S. 160 (1949):

> If we assume, for example, that a child is kidnaped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger.

*Id.* at 183 (Jackson, J., dissenting).

479 (1928) (Brandeis, J., dissenting) ("Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent."). The majority would do well to recall Justice Jackson's admonition in *United States* v. *Di Re*, 332 U.S. 581, 595 (1948):

> We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment.

In sum, the State has not carried its burden to demonstrate that the challenged DUI roadblock was justified by any increase in the effectiveness of DUI law enforcement from its operation. This is not to say that such a showing might not be made in a future case. In the absence of such a showing, however, it was error for the court to deny defendant's motion to suppress. I would reverse and remand.