**PEOPLE of the State of Colorado, Petitioner,**

v.

**Teddy Ralph RISTER, Respondent.**

**No. 89SC212.**

Supreme Court of Colorado, En Banc.

Dec. 10, 1990.

Rehearing Denied Jan. 28, 1991.

Stuart A. VanMeveren, Dist. Atty., Loren B. Schall, Asst. Dist. Atty., Daniel J. Kaup, Deputy Dist. Atty., Fort Collins, for petitioner.

David F. Vela, State Public Defender, William S. Schurman, Deputy State Public Defender, Denver, for respondent.

Thomas T. Crumpacker, Carbondale, Bradley H. Dickerson, Denver, for amici curiae The American Civ. Liberties Union Foundation of Colorado and Nat. Lawyers Guild, Colorado Chapter.

Pozner, Hutt, Gilman & Kaplan, Abraham V. Hutt, Denver, for amici curiae The Colorado Crim. Defense Bar, Nat. Ass'n of Crim. Defense Lawyers and Colorado Trial Lawyers Ass'n.

Chief Justice ROVIRA delivered the Opinion of the Court.

This certiorari[1] proceeding presents the question whether the Colorado State Patrol's brief stop of the defendant, Teddy Ralph Rister, while it was operating a sobriety checkpoint on a county highway violates the fourth and fourteenth amendments to the United States Constitution and article II, section 7, of the Colorado Constitution. The Jackson County District Court affirmed the county court's ruling that the sobriety checkpoint was unconstitutional, and suppressed the evidence obtained as a result of the stop. We reverse.

I

In September 1985, Colonel John Dempsey, Chief of the Colorado State Patrol, issued an "Operational Procedures Bulletin" authorizing the use of sobriety checkpoints "to reduce the number of motor vehicle accidents in which alcohol is a contributing factor" and "to aid in the detection, apprehension and/or deterrence of drivers who are intoxicated or under the influence of alcohol." The bulletin set forth numerous procedures to be followed in establishing and operating a sobriety checkpoint, including providing the criteria for selecting a sobriety-checkpoint site, and the physical requirements of a checkpoint site. The bulletin provided that:

As each vehicle is contacted the trooper will approach the motorist and state "This is a Colorado State Patrol Sobriety Checkpoint set up to determine the sobriety of drivers." The trooper will then normally ask for the driver's license only. If during this brief encounter the trooper perceives no evidence of alcohol impairment, the motorist should be allowed to proceed immediately, being assisted back into traffic by an officer. Constitutional rights of motorists must be foremost in the minds of our officers. The purpose of a sobriety checkpoint is deterrence/apprehension of DUI. If other types of violations or articulable suspicions of other violations are immediately discernible, those may also be investigated; however, as a general rule, the encounter involving checking the driver's license should be adequate to determine any evidence of alcohol impairment.

During the stop, the trooper will be alert for any articulable conditions normally associated with persons driving under the influence. These conditions would include, but not be limited to, odor of alcoholic beverage about the driver, slurred speech, flushed appearance, disorderly or unusual conduct, visual disorders and/or lack of muscular coordination. In the event any condition or combination of conditions exist which give the trooper probable cause to believe the driver may be under the influence of alcohol, the driver may then be requested to perform certain psychomotor coordination tests and/or submit to a chemical test of either his blood or breath. If

---

1. The People petitioned for certiorari pursuant to § 13-6-310, 6A C.R.S. (1987), and we granted certiorari pursuant to C.A.R. 49.

sufficient evidence of intoxication is then developed, the driver will be arrested. The bulletin provided that state patrol officers would take no action against motorists who make "an apparent attempt to avoid the checkpoint" by turning around or turning off the highway before reaching the checkpoint, unless "a specific action other than merely turning around would justify pursuit." Moreover, the checkpoints would be maintained for a predetermined period of time, but would be canceled if "significant traffic congestion at the site or other circumstances arise ... as determined by the on-scene officer-in-charge." Under the procedures outlined in the bulletin, the state patrol would publicize the use of sobriety checkpoints and the dates of their use to deter alcohol-impaired driving, but "the exact location and times of scheduled checkpoints will be kept confidential." Written instructions corresponding to the bulletin's specified procedures would be provided to all officers operating the checkpoint.

Lieutenant Ralph Martin of the Colorado State Patrol authorized a sobriety checkpoint in Jackson County to be implemented on July 5, 1986, a Saturday during the Fourth of July weekend. The checkpoint was to be located at the three-way intersection of Highway 14 and County Road 12. On July 5, six state patrol officers, who had been given specific instructions on how to conduct the checkpoint screening of vehicle operators, set up traffic cones in the intersection demarcating two adjacent, off-road areas in which vehicles would be directed to stop. One "stop area" was located on the northwest corner of the intersection, and vehicles southbound on Highway 14 were directed to stop in that area. Another stop area was located on the east side of the intersection where a dirt parking area was located, and vehicles northbound on Highway 14 and eastbound on County Road 12 were directed to stop there. Signs stating "Be Prepared to Stop" and "sobriety checkpoint" were placed two-tenths and one-tenth of a mile before the checkpoint.

The state patrol operated the checkpoint for two and one-half hours, from 4:30 p.m. to 7:00 p.m., and stopped 233 vehicles that entered the Highway 14–County Road 12 intersection. All vehicles were stopped; however, officers diverted all traffic past the checkpoint on a few occasions when volume would not allow additional vehicles without creating safety hazards or imposing unreasonable delay to motorists. The average stop lasted three minutes. Several vehicles turned around or turned off before reaching the intersection, and the state patrol did not attempt to stop them.

The defendant, who was eastbound on County Road 12, was asked to drive into the checkpoint stop area when he came to a stop sign at the intersection. The defendant requested permission to turn right at the intersection and proceed south on Highway 14. The officer denied the request and directed the defendant into the parking area. After the defendant parked his car, two state patrol officers saw the defendant and the passenger in his car leave the car and switch places so that the passenger was sitting in the driver's seat. An officer subsequently checked the defendant's driver's license on a computer and found that his license had been denied. The officer then issued the defendant a summons and complaint charging him with driving a motor vehicle while license denied in violation of section 42–2–130, 17 C.R.S. (1984 & Supp.1990).

The defendant moved to suppress "any statements or observations made by law enforcement officers surrounding the seizure and arrest of the defendant" on the ground that there was no probable cause to seize and detain him. Following a suppression hearing, the county court ruled that since the stop was not based on probable cause or reasonable suspicion it was unconstitutional under the fourth amendment of the United States Constitution and article II, section 7, of the Colorado Constitution, and suppressed the prosecution's evidence against the defendant. The district court affirmed, holding that "seizures must stem from probable cause or at least an articulable suspicion, the use of warrants or at least legislative authority."

## II

The fourth amendment, which is applicable to the states through the fourteenth amendment,[2] provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Because we are bound by the United States Supreme Court's decisions concerning the fourth amendment, *People v. Quintana,* 785 P.2d 934, 938 (Colo.1990), we look to that Court's decisions to determine whether the state patrol's sobriety-checkpoint stop of the defendant violated his fourth amendment right against unreasonable seizures.

■ Although the state patrol's stop of the defendant's vehicle was brief, the stop was a "seizure" under the fourth amendment. *Michigan Dep't of State Police v. Sitz,* ── U.S. ──, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); *see United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). Accordingly, we must decide whether the state patrol's seizure of the defendant was "reasonable" under the fourth amendment.

Recently the United States Supreme Court considered the constitutionality of highway sobriety checkpoints in a case similar to the one now before us. In *Michigan Department of State Police v. Sitz,* ── U.S. ──, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Michigan State Police established a sobriety-checkpoint pilot program that set forth numerous guidelines governing checkpoint operations, site selection, and publicity.

Under the guidelines, checkpoints would be set up at selected sites along state roads. All vehicles passing through a checkpoint would be stopped and their drivers briefly examined for signs of intoxication. In cases where a checkpoint officer detected signs of intoxication, the motorist would be directed to a location out of the traffic flow, where an officer would check the motorist's driver's license and car registration and, if warranted, conduct further sobriety tests. Should the field tests and the officer's observations suggest that the driver was intoxicated, an arrest would be made. All other drivers would be permitted to resume their journey immediately.

*Id.* 110 S.Ct. at 2484. During the only checkpoint set up by the Michigan State Police prior to the Court's decision in *Sitz,* 126 vehicles were stopped. The average delay for each vehicle was about 25 seconds. During the 1 hour and 15 minute duration of the checkpoint's operation, two drivers were detained for field sobriety testing, and one of the two was arrested for driving under the influence of alcohol. A third driver who drove through the checkpoint without stopping was pulled over and arrested for driving under the influence.

"[A]ddress[ing] only the initial stop of each motorist passing through a checkpoint and the associated preliminary questioning and observation by checkpoint officers,"[3] the Court reaffirmed that a "balancing analysis" derived from *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), and applied in cases concerning highway checkpoints for detecting illegal aliens was the appropriate test for determining whether the checkpoint stops violated the fourth amendment. *Sitz,* 110 S.Ct. at 2485. The analysis in the context of checkpoint seizures balances "the State's interest in preventing drunken driving, the extent to which [the checkpoint] system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped." *Id.* at 2488. The Court found that the state's interest in eradicating

---

**2.** *E.g., Dunaway v. New York,* 442 U.S. 200, 207, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979).

**3.** The Court noted that detention of particular motorists for field sobriety testing may require satisfaction of an "individualized suspicion standard." 110 S.Ct. at 2485.

drunken driving is substantial,[4] while the "intrusion on motorists stopped briefly at sobriety checkpoints[ ] is slight." *Id.* at 2486. Moreover, the Court found that the temporary checkpoint, which resulted in the arrest for driving while intoxicated of about 1.5% of those stopped, "reasonably advanced" the state's interest in eliminating drunken driving. *Id.* at 2487–88.

■ Applying the balancing test for checkpoint stops as enunciated in *Sitz*,[5] we conclude that the checkpoint stop of the defendant was not an "unreasonable" seizure under the fourth amendment. It is beyond debate that drunken driving is a serious problem, and that the state has a substantial interest in preventing the loss of life and damage to property caused by drunk drivers. *See, e.g., Noe v. Dolan,* 197 Colo. 32, 37, 589 P.2d 483, 486 (1979). The burden on the fourth amendment rights of the motorists who were stopped at the checkpoint was relatively minor. Motorists were directed to pull off the road, and state patrol officers would request that each produce a driver's license. The duration of the average "stop" in this case was 3 minutes, in contrast to the 25–second average "stop" in *Sitz.* We cannot conclude that this fact alone renders the checkpoint unconstitutional under the fourth amendment, in view of the limited discretion afforded state patrol officers at the checkpoint and amount of time reasonably necessary to stop vehicles and check for driver licenses and signs of intoxication.

The Highway 14 checkpoint stops suffer from none of the defects the United States Supreme Court found to contribute to the unreasonableness of police searches and seizures of vehicles on the open road. The primary evil the Court sought to prevent in random stops of vehicles was "the 'kind of standardless and unconstrained discretion'" present in those kinds of stops. *Sitz,* 110 S.Ct. at 2487 (quoting *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979)); *see Prouse,* 440 U.S. at 662, 99 S.Ct. at 1400; *United States v. Brignoni–Ponce,* 422 U.S. 873, 882–83, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). Other defects in police seizures of vehicles which the Court has identified as "subjective" factors weighing against permitting the seizures include the "'generating of concern or even fright on the part of lawful travelers,'" *Prouse,* 440 U.S. at 656, 99 S.Ct. at 1397 (quoting *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083); and interfering with motorists' freedom of movement, causing inconvenience, consuming time, and creating substantial anxiety in motorists, *see id.* at 656, 99 S.Ct. at 1397. The state patrol officers in this case had limited discretion over which vehicles could be stopped. The checkpoint-operating guidelines required that the officers stop all cars entering the intersection, with the only exception being that officers could permit all cars, or a fixed number of cars, to proceed through the intersection if traffic began backing up. The location of the

---

**4.** No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's roads are legion. The anecdotal is confirmed by the statistical. "Drunk drivers cause an annual death toll of over 25,000 and in the same time span cause nearly one million personal injuries and more than five billion dollars in property damage." .... For decades, this Court has "repeatedly lamented the tragedy."

110 S.Ct. at 2486 (citations omitted).

**5.** We recognize that in *Sitz* the Court was concerned with the question whether Michigan's checkpoint system was *generally* valid under the fourth amendment whereas in this case we are confronted with a narrower issue—whether the defendant's fourth amendment rights were violated. However, it is neither practical nor likely to be profitable to attempt to distinguish between the validity of the state patrol's checkpoint system generally and the state patrol's seizure of the defendant specifically. The remedy the defendant sought, and obtained, from the trial court was the suppression of evidence obtained against him as a result of the checkpoint seizure. Because the exclusionary rule is designed primarily to deter unlawful police conduct, *e.g., United States v. Calandra,* 414 U.S. 338, 347–48, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561; *People v. Schoondermark,* 759 P.2d 715, 718 (Colo.1988), the defendant's suppression motion necessarily called into question the validity of the checkpoint system generally, which in operation resulted in the seizure of the defendant. Accordingly, the United States Supreme Court's analysis in *Sitz* is equally applicable in this case.

**488**

checkpoint was authorized by supervisory personnel and the checkpoint was operated in a nondiscriminatory manner. The stop of each vehicle by state patrol officers was limited to a request to see the driver's license and briefly determining whether the driver exhibited signs of intoxication. Moreover, as the United States Supreme Court noted, checkpoint stops differ markedly from roving-patrol stops because:

"[T]he subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop. In [*United States v.*] *Ortiz*, [422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975),] we noted:

" '[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.' 422 U.S., at 894–895 [95 S.Ct. at 2587–2488]."

*Sitz*, 110 S.Ct. at 2486–87 (quoting *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083) (brackets in *Sitz*). The defendant does not identify, and we do not find in the record, that the "subjective" concerns present in roving-patrol stops were present in the Highway 14 checkpoint stops. *Cf. Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. at 3083 (routine checkpoint stops do not intrude on motorists in the same manner as roving-patrol stops: interference with legitimate traffic is minimal; checkpoint stops appear to and actually do involve less discretionary enforcement activity; and any claim that "particular exercise of discretion in locating or operating a checkpoint is

unreasonable is subject to post-stop judicial review"). In view of the limited scope of the checkpoint stop, in which state patrol officers were not permitted to stop vehicles that turned around before entering the checkpoint, to engage in prolonged questioning, or to search vehicles, *cf. Martinez–Fuerte*, 428 U.S. at 558, 566–67, 96 S.Ct. at 3083, 3086–87; *People v. Andrews*, 173 Colo. 510, 514, 484 P.2d 1207, 1209 (1971), we find that the intrusion on motorists' fourth-amendment rights was reasonable.[6]

The final factor to consider in the *Sitz* balancing test is whether the Highway 14 checkpoint reasonably advanced the state's interest in combatting drunken driving. The question this factor presents is whether in the furtherance of the state's legitimate goal of combatting drunken driving the checkpoint stop "is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail," *Prouse*, 440 U.S. at 659, 99 S.Ct. at 1399. The Court in *Sitz* explained that this factor did not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." 110 S.Ct. at 2487. However, the requirement that the method chosen by police must reasonably advance the state's interest in dealing with a serious public danger serves an important role in preventing blanket police detention of motorists where there is only a "marginal contribution to roadway safety," *Prouse*, 440 U.S. at 661, 99 S.Ct. at 1400.

The state patrol set up the checkpoint site on Highway 14 on the basis of information that drunk drivers had been arrested or had been involved in accidents on roads, such as Highway 14, that provided access to nearby recreational sites.[7] Notwith-

---

**6.** As in *Sitz*, no allegation has been raised that any state patrol officer subjected any person to unreasonable treatment, which may be subjected to post-stop judicial review. *Sitz*, 110 S.Ct. at 2485 (citing *Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. at 3083). Nor are we concerned today with the reasonableness of any search or seizure occurring after a police officer at a sobriety

checkpoint stop suspects that a driver is intoxicated and further detains the driver for roadside sobriety testing. *Cf. People v. Carlson*, 677 P.2d 310 (Colo.1984).

**7.** Although the sobriety checkpoint was ultimately located at the intersection of Highway 14 and County Road 12, a state patrol sergeant had

standing the lack of any driving-under-the-influence arrests at the Highway 14 checkpoint, we conclude that the checkpoint reasonably advanced the state's interest in combatting drunken driving. The *Sitz* Court approved a sobriety checkpoint even though only 1.5% of the drivers passing through the checkpoint were arrested for alcohol impairment. 110 S.Ct. at 2487; *cf. id.* at 2488 (noting that in *Martinez–Fuerte*, 428 U.S. at 554, 96 S.Ct. at 3081, illegal aliens were found in only .12% of cars passing through immigration checkpoint, and that the ratio of illegal aliens detected to vehicles stopped—considering that sometimes more than one illegal alien was found in a single vehicle—was about .5%). Moreover, in this case, the location of the checkpoint was established on a reasonable basis—information available to the State Patrol indicated that roads in the area of recreational sites near the city of Walden had been used by drunken drivers. Finally, the announcement and establishment of a sobriety checkpoint undoubtedly had some effect on advancing the state's interest in preventing drunken driving.

As we view the balance of the competing interests involved in the sobriety-check-point stops conducted by the State Patrol in this case, the relatively minor intrusion on the motorists' fourth amendment rights to accomplish the state's objective of reducing drunken driving was not unreasonable.

### III

■ Article II, section 7, of the Colorado Constitution provides in relevant part that "[t]he people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures." Although article II, section 7, is almost identical to the fourth amendment of the United States Constitution, we have held that the Colorado Constitution's search and seizure provision provides greater protection than does the fourth amendment.[8] *E.g., People v. Oates,* 698 P.2d 811, 815 (Colo.1985); *People v. Sporleder,* 666 P.2d 135, 140 (Colo.1983); *Charnes v. DiGiacomo,* 200 Colo. 94, 98–99, 612 P.2d 1117, 1120 (1980).

As the *amicus curiae* Colorado Criminal Defense Bar has pointed out, we have previously noted that "[s]everal times we have determined that the Colorado proscription against unreasonable searches and seizures protects a greater range of privacy interests than does its federal counterpart," *Oates,* 698 P.2d at 815. *See, e.g., People v.*

originally proposed that the checkpoint be located at the intersection of Jackson County Roads 12 and 18, which is about 5 miles from the Highway 14–County Road 12 intersection. In a memorandum proposing the checkpoint, the sergeant stated that he had

> attempted to research and establish D.U.I. arrests and D.U.I. involved data for Jackson [County Road] 12 and [County Road] 18 in order to hold a sobriety checkpoint on these roads the weekend of July 4, 1986.
>
> The data is extremely limited due to the small amount of time a trooper has been stationed in the area. I have had to rely on Jackson County Sheriff's Office for a limited amount of information on D.U.I arrests they have made and mostly cold accident reports they have taken.
>
> Jackson County Sheriff's Office records indicate D.U.I. arrests on [County Road] 12 on June 13, 1984 at [3:45 p.m.] and July 28, 1984 at [2:50 p.m.]. Accidents involving drinking drivers reveal one on June 13, 1984 at [3:45 p.m.]. On [County Road] 18, one accident involving a drinking driver occurred on August 11, 1984 at [7:30 p.m.] and one on August 5, 1984 at [3:00 p.m.].

> The most important statistic is that on May 4, 1986 at [6:00 a.m.] and on May 17, 1986 at [12:10 a.m.], there were drinking driver accidents on [County Road] 18. On May 24, 1986 at [7:15 p.m.] there was one D.U.I. accident on [County Road] 12.
>
> Although there is limited data for the location, common sense and experience of Sheriff's deputies and Grand County troopers confirm numerous drinking drivers commuting on this road between Walden and recreational sites at Lake John and Delanney Buttes Lakes on holiday weekends.

**8.** The parties dispute whether our decisions in *People v. Benner,* 187 Colo. 309, 530 P.2d 964 (1975), and *People v. Andrews,* 173 Colo. 510, 484 P.2d 1207 (1971), stand for the proposition that checkpoint stops are permissible under article II, section 7, of the Colorado Constitution. As we read *Benner* and *Andrews,* neither case has any bearing on the validity of checkpoint stops under article II, section 7. Each case concerns a federal constitutional challenge to a checkpoint stop, *see Benner,* 187 Colo. at 311–12, 530 P.2d at 965; *Andrews,* 173 Colo. at 512–14, 484 P.2d at 1208–10, and we made no reference in those cases to the Colorado Constitution.

*Corr*, 682 P.2d 20 (Colo.), *cert. denied*, 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984); *Sporleder*, 666 P.2d at 139–43; *Charnes v. DiGiacomo*, 200 Colo. at 98–99, 612 P.2d at 1120–21. However, our approach in determining what kinds of seizures are "reasonable" under article II, section 7, of the Colorado Constitution is similar to the approach taken by the United States Supreme Court. We have implicitly recognized that to assess the reasonableness of police conduct as a general proposition "there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails,'" *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 534–35, 87 S.Ct. 1727, 1733–34, 18 L.Ed.2d 930 (1967)) (brackets in *Terry*). *See Stone v. People*, 174 Colo. 504, 510, 485 P.2d 495, 498 (1971).

Accordingly, when we have been confronted with the question of the reasonableness of seizures that are substantially less intrusive than arrests, we have, as the United States Supreme Court has, balanced the competing interests of the state in accomplishing its legitimate goals and of the individual in the inviolateness of his or her person. *See, e.g., People v. Savage*, 698 P.2d 1330, 1334 (Colo.1985) (before a person may be subjected to investigatory stop and limited search, articulable and specific basis in fact must exist for suspecting that criminal activity has taken place, is in progress, or is about to occur; purpose of intrusion must be reasonable; and scope

and character of intrusion must be reasonably related to its purpose) (applying *Stone v. People* test to determine whether seizure based on less than probable cause is reasonable); *State v. Kabayama*, 94 N.J.Super. 78, 82–83, 226 A.2d 760, 763 (1967) (in checkpoint-stop case, balancing inconvenience to motorists with "necessity to protect the general public"), *cited with approval in Andrews*, 173 Colo. at 514, 484 P.2d at 1209.

Neither the defendant nor *amici curiae* have suggested any means other than by balancing the interests of the state and motorists by which we are to determine the reasonableness of the checkpoint stops. In *Exotic Coins, Inc. v. Beacom*, 699 P.2d 930 (Colo.), *appeal dismissed*, 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 214 (1985), we considered an argument similar to the defendant's in this case that the "reasonableness" standard of article II, section 7, of the Colorado Constitution should be construed differently from the fourth amendment's "reasonableness" requirement, and concluded, "We see no reason to reach a different result here under the Colorado Constitution than that reached under the United States Constitution."

We can find no basis in checkpoint-stop cases for concluding that "reasonableness" under article II, section 7, should be determined by a procedure other than balancing the interests of the state and the motorists, and determining whether the checkpoint stop in question reasonably advances the state's interests.[9] We hold that

---

9. Numerous courts in other states have similarly upheld the constitutionality of sobriety checkpoints by similarly balancing the competing interests of the state and individual under their state constitutions, *see, e.g., Ingersoll v. Palmer*, 43 Cal.3d 1321, 1329, 241 Cal.Rptr. 42, 48, 743 P.2d 1299, 1304–05, 1311–13 (1987) ("As we have explained, both the majority and concurring minority in [a previous California search-and-seizure case], and ultimately, all other pertinent authorities determine the constitutional reasonableness of searches and seizures by a balancing test...."); *State v. Deskins*, 234 Kan. 529, 530–531, 532–535, 673 P.2d 1174, 1177, 1178–81 (1983); *Little v. State*, 300 Md. 485, 505–506, 479 A.2d 903, 913 (1984); *Opinion of the Justices*, 128 N.H. 14, 16, 509 A.2d 744, 745 (1986); *State v. Coccomo*, 177 N.J.Super. 575, 583, 427 A.2d

131, 135 (1980); *People v. Torres*, 125 Misc.2d 78, 79, 81–82, 478 N.Y.S.2d 771, 772, 774 (1984); *Lowe v. Commonwealth*, 230 Va. 346, 337 S.E.2d 273, 275 n. 1, 276 (1985), *cert. denied*, 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986), and the federal Constitution, *see, e.g., Illinois v. Bartley*, 109 Ill.2d 273, 284–285, 93 Ill.Dec. 347, 352, 486 N.E.2d 880, 885 (1985), *cert. denied*, 475 U.S. 1068, 106 S.Ct. 1384, 89 L.Ed.2d 608 (1986); *State v. Riley*, 377 N.W.2d 242, 243 (Iowa App. 1985); *State v. Cloukey*, 486 A.2d 143, 147 (Me. 1985); *City of Las Cruces v. Betancourt*, 105 N.M. 655, 658, 660, 735 P.2d 1161, 1164, 1166 (Ct.App.1987); *People v. Scott*, 63 N.Y.2d 518, 524–528, 483 N.Y.S.2d 649, 651–653, 473 N.E.2d 1, 3–6 (1984); *State v. Goines*, 16 Ohio App.3d 168, 170, 474 N.E.2d 1219, 1221 (1984).

under the facts presented in this case the balance under article II, section 7, should be struck in favor of the reasonableness of the Highway 14 checkpoint stops.[10]

The judgment of the district court is reversed, and this case is remanded to the district court for further proceedings consistent with this opinion.

QUINN, J., dissents.

LOHR and KIRSHBAUM, JJ., join in the dissent.

Justice QUINN dissenting:

I dissent. Although the United States Supreme Court in *Michigan Department of State Police v. Sitz*, ⸺ U.S. ⸺, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), held that a state's use of a highway sobriety checkpoint program does not violate the Search and Seizure Clause of the United States Constitution, I would affirm the suppression ruling in this case on the basis that the Search and Seizure Clause of the Colorado Constitution, Colo. Const. art. II, § 7, prohibited the temporary seizure of the defendant when, as here, the seizure was totally unsupported by even a minimal level of individualized suspicion that he was operating a motor vehicle while under the influence of, or while impaired by, intoxicating liquor.

## I.

In *Sitz*, the United States Supreme Court considered whether Michigan's use of a highway sobriety checkpoint program violated the Search and Seizure Clause of the United States Constitution. In upholding the program, the Court acknowledged that a constitutional seizure occurs when a motorist is stopped at a checkpoint and subjected to preliminary questioning and observation by checkpoint officers, 110 S.Ct. at 2485; *see also Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), but concluded that the temporary seizure of the motorist, along with the associated questioning and observation of the motorist by checkpoint officers, was constitutionally permissible because "the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." 110 S.Ct. at 2488.

This court, of course, is obligated to follow the *Sitz* decision as a matter of federal constitutional law. Nonetheless, the *Sitz* holding is remarkable for its failure to acknowledge the long-standing search and seizure principle, first enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that the temporary seizure of a person for a brief investigation is constitutionally permissible as long as there are circumstances which, although not amounting to probable cause essential for a traditional arrest, are sufficient when judged against an objective standard to support a reasonable suspicion that "criminal activity may be afoot." 392 U.S. at 30, 88 S.Ct. at 1884. The sobriety checkpoint program in *Sitz* was aimed at the acquisition of incriminating evidence for use in a criminal prosecution for drunken driving. Intrusions into personal privacy or security that have as their purpose the discovery of incriminating evidence traditionally have been subjected to, at the very least, a minimal level of reasonable suspicion. *See, e.g., Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (warrantless taking of scrapings from fingernails of murder suspect, for whom police had probable cause to arrest, was constitutionally permissible when suspect appeared voluntarily at police station for questioning); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (officer may make a reasonable investigatory stop and frisk of suspect on basis of informer's tip

10. We find no merit in the defendant's arguments that the state patrol conducted a "search" violative of article II, section 7, of the Colorado Constitution. As we stated in *People v. Carlson*, 677 P.2d 310, 316 (Colo.1984), "a driver of a motor vehicle has no legitimate expectation of privacy in his physical traits and demeanor that are in the plain sight of an officer during a valid traffic stop." Under the facts presented in this case, the state patrol's Highway 14 checkpoint stops were not unreasonable and constituted valid traffic stops.

that suspect is armed and carrying narcotics).

Prior to *Sitz*, the only case upholding a suspicionless seizure of a motorist for temporary investigation was *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).[1] In *Martinez–Fuerte*, the Court held that routinely stopping motorists for brief questioning of the occupants of the motor vehicle at permanent checkpoints operated by the Border Patrol for brief questioning of the occupants of the motor vehicle "may be made in the absence of any individualized suspicion" because of the demonstrated need for such enforcement technique in dealing with the problem of illegal immigration at this country's borders. 428 U.S. at 562, 96 S.Ct. at 3085. It should be noted that the Court expressly limited its holding "to the type of stops described in this opinion." 428 U.S. at 567, 96 S.Ct. at 3087. Those stops, as described in the opinion, were made at "permanent" checkpoints under circumstances where the stops were routine and there was little opportunity for unreasonable exercise of discretion by the Border Patrol officers. 428 U.S. at 553–54, 96 S.Ct. at 3081.

As Justice Stevens emphasized in his dissenting opinion in *Sitz*, there is a constitutionally significant difference between a routine stop at a permanent and clearly posted immigration checkpoint and a temporary highway sobriety checkpoint which the motorist encounters by surprise. "A motorist with advance notice of the location of a permanent checkpoint has an opportunity to avoid the search entirely, or at least prepare for, and limit, the intrusion on her privacy." 110 S.Ct. at 2492. No such opportunity is available, however, in the case of a temporary sobriety checkpoint, which often depends for its effectiveness on the element of surprise. *Id.* There is another significant difference, as pointed out by Justice Stevens, between the amount and kind of discretion that an officer may exercise at these two types of checkpoints:

> A check for a driver's license, or for identification papers at an immigration checkpoint, is far more easily standardized than is a search for evidence of intoxication. [An] officer who questions a motorist at a sobriety checkpoint has virtually unlimited discretion to detain the driver on the basis of the slightest suspicion. A ruddy complexion, an unbuttoned shirt, bloodshot eyes or a speech impediment may suffice to prolong the detention. Any driver who had just consumed a glass of beer, or even a sip of wine, would almost certainly have the burden of demonstrating to the officer that her driving ability was not impaired.

*Id.* at 2493. Finally, many of the stops at permanent immigration checkpoints occur during daylight hours, while the sobriety checkpoints are often operated at night. *Id.* A seizure of the motorist, followed by interrogation and even a cursory search at night, is clearly "more offensive than a daytime stop that is almost as routine as going through a toll gate." *Id.* These fears are not the sole concern of the guilty, for "[t]o be law abiding is not necessarily to be spotless" and "what begins mildly may by happenstance turn severe." *Id.*

---

1. Subsequent to *Martinez–Fuerte*, the Court in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), utilized the balancing test, without regard to individualized suspicion, in upholding a drug testing program for employees of the United States Custom Service who apply for promotion to positions directly involving the confiscation of drugs or to positions which require the incumbent to carry a firearm. The Court emphasized in *Von Raab*, however, that the testing program was not designed to serve the ordinary needs of law enforcement and was not directed to the discovery of evidence for use in a criminal prosecution. 489 U.S. at ——, 109 S.Ct. at 1397. *See also Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (Federal Railroad Administration regulations mandating blood and urine tests for employees involved in train accidents and authorizing railroads to administer breath and urine tests for employees who violate certain safety rules upheld under balancing test without regard to individualized suspicion). Administrative or regulatory inspection searches have long been analyzed under a balancing process that involves weighing the governmental interest against the degree of intrusion upon privacy without regard to individualized or reasonable suspicion of criminal activity. *See Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

No one doubts the enormous tragedies caused by drunken drivers on our roads. Nor can one seriously question the important nature of the state's interest in eliminating this social scourge. Because, however, the critical inquiry in this case is whether the state's interests are actually furthered by subjecting the motoring public to temporary seizures of their persons, and associated questioning and observation, in the absence of reasonable individualized suspicion, what may be seriously questioned under the balancing test of *Sitz* is the extent to which a highway sobriety checkpoint program achieves the state objective of preventing or deterring drunken driving. Again, as observed by Justice Stevens in his dissenting opinion, there has been virtually no showing of meaningful statistical relationships between sobriety checkpoints and the actual impact on arrest rates or reduction in highway fatalities:

> Because the Michigan program was patterned after an older program in Maryland, the trial judge gave special attention to that State's experience. Over a period of several years, Maryland operated 125 checkpoints; of the 41,000 motorists passing through those checkpoints, only 143 persons (0.3%) were arrested. The number of man-hours devoted to these operations is not in the record, but it seems inconceivable that a higher arrest rate could not have been achieved by more conventional means. Yet, even if the 143 checkpoint arrests were assumed

to involve a net increase in the number of drunk driving arrests per year, the figure would still be insignificant by comparison to the 71,000 such arrests made by Michigan State Police without checkpoints in 1984 alone. . . .

> Any relationship between sobriety checkpoints and an actual reduction in highway fatalities is even less substantial than the minimal impact on arrest rates. As the Michigan Court of Appeals pointed out, "Maryland has conducted a study comparing traffic statistics between a county using checkpoints and a control county. The results of the study showed that alcohol-related accidents in the checkpoint county decreased by ten percent, whereas the control county saw an eleven percent decrease; and while fatal accidents in the control county fell from sixteen to three, fatal accidents in the checkpoint county actually doubled from the prior year."

*Id.* at 2491–92 (footnotes and citations omitted). Similar observations have been made by state courts in concluding that sobriety checkpoint programs have not advanced the public interest in curbing drunken driving in a manner that justifies the accompanying intrusion into personal privacy and security. *E.g., State v. Henderson,* 114 Idaho 293, 756 P.2d 1057 (1988); *State v. Koppel,* 127 N.H. 286, 499 A.2d 977 (1985); *City of Seattle v. Mesiani,* 110 Wash.2d 454, 755 P.2d 775 (1988).[2]

**2.** In *Henderson,* the Idaho Supreme Court invalidated a DUI roadblock, authorized by the Boise Police Department, under the Idaho constitutional prohibition against unreasonable searches and seizures. The court concluded that DUI roadblocks were not an efficient means of detecting or deterring drunken driving, especially in view of the Boise Chief of Police's testimony that "the same number of officers on patrol would make more DUI arrests than the same number of officers engaged in a roadblock." 756 P.2d at 1060.

In *Koppel,* the New Hampshire Supreme Court invalidated a drunken driving roadblock program under the New Hampshire constitution because the roadblock stops required no individualized suspicion and the state failed to demonstrate that the roadblocks produced sufficient public benefit to outweigh their intrusion on individual rights. In the course of its opinion the court observed as follows:

> The record indicates that 47 roadblocks were set up on 21 weekend nights between April 29, 1984, and October 20, 1984. A total of 1,680 vehicles were stopped, resulting in only 18 DWI arrests. During roughly the same six months, the Concord police made 175 DWI arrests by traditional methods; *i.e.,* through the use of roving patrols.

499 A.2d at 979. *But cf. Opinion of the Justices,* 128 N.H. 14, 509 A.2d 744 (1986) (upholding validity under New Hampshire constitution of statutory scheme authorizing law enforcement agency to apply for a warrant for sobriety checkpoint in manner similar to application for search warrant or administrative inspection warrant, and permitting judge to issue warrant only upon express finding that proposed checkpoint would be reasonably effective means of detecting and apprehending impaired motorists and that public interest in drunken driving en-

Irrespective of the highly questionable effectiveness of highway sobriety checkpoints as a deterrent mechanism for drunken driving, the United States Supreme Court in *Sitz* has ruled that nothing in the United States Constitution prohibits such intrusions into personal privacy and security. This court is bound by that decision as a matter of federal constitutional doctrine. What causes me to depart from this court's opinion, however, is its adoption, *in toto* and without independent analysis, of the *Sitz* balancing test and its incorporation of that test into this state's constitutional jurisprudence.

## II.

Article II, section 7 of the Colorado Constitution states that the people shall be secure in their "persons" and "effects" from unreasonable searches and seizures. Although this constitutional provision is similar in text to the Fourth Amendment, we have interpreted the Colorado Constitution in a manner more protective of personal privacy and security than the United States Supreme Court has been willing to recognize under the United States Constitution. *E.g. People v. Oates*, 698 P.2d 811 (1985) (holding, contrary to Supreme Court's analysis in *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), that installation of a "beeper" in a chemical drum prior to its transfer to a buyer infringed a legitimate expectation of privacy under the Colorado Constitution and thus constituted a "search" requiring a warrant); *People v. Corr*, 682 P.2d 20 (Colo.), *cert. denied* 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984) (in absence of a grand jury subpoena, the Colorado Constitution, in contrast to the United States Constitution, *requires* a probable cause warrant for seizure of telephone toll records); *People v. Sporleder*, 666 P.2d 135 (Colo.1983) (holding, contrary to United States Supreme Court precedent, that war-

rantless installation of pen register to record numbers dialed from defendant's home telephone constitutes an unreasonable search under Colorado Constitution); *Charnes v. DiGiacomo*, 200 Colo. 94, 612 P.2d 1117 (1980) (holding, contrary to United States Supreme Court precedent, that under Colorado Constitution a bank depositor has legitimate expectation of privacy in bank records); *Hernandez v. People*, 153 Colo. 316, 385 P.2d 996 (1963) (Colorado Constitution, in contrast to federal constitution, requires that probable cause be supported by oath or affirmation *reduced to writing*). This is as it should be under our federal system, for the Bill of Rights does not establish a "ceiling" or outer limit of individual liberties, but rather establishes only a "floor" or minimum level of constitutional protections. While a state court may not go below this floor and infringe upon federally guaranteed rights by a more restrictive analysis of its state constitution, a state court has always been free to find in its state constitution greater protections against governmental intrusions than granted by the federal constitution. A state court, therefore, "as a matter of its own law," may impose "greater restrictions on police activity" than the restrictions imposed by the United States Supreme Court under "federal constitutional standards." *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *see* Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489 (1977); Pollock, *State Constitutions as Separate Sources of Fundamental Rights*, 35 Rutgers L.Rev. 707 (1983); Sager, *Forward: State Courts and the Strategic Space Between the Norms and Rules of Constitutional Law*, 63 Tex.L.Rev. 959 (1985).

The liberty interests of Colorado citizens find their source not only in the federal constitutional and statutory law, but also in state constitutional jurisprudence and the

forcement would outweigh intrusion upon individual motorists).

In *Mesiani*, the Washington Supreme Court invalidated Seattle's sobriety checkpoint program under the Washington Constitution. In the course of its opinion the court noted that the

City of Seattle "has failed to demonstrate the need for sobriety checkpoints or that less intrusive alternatives could not achieve most of the constitutionally permissible benefits sought, such as the addition of more officers to its special enforcement unit." 755 P.2d at 778.

legislative enactments of our General Assembly. State courts can effectively approach state constitutional interpretation in a manner more responsive to these interests than can the United States Supreme Court, which is forced to operate from a homogenized, abstracted, national vision, looking for the lowest common denominator and taking into account many of the variations from state to state and region to region. Sager, 63 Tex.L.Rev. at 976. When, as here, a state constitutional claim is properly raised, a state court has an affirmative duty to engage in an independent analysis of state constitutional principles when a critical evaluation of controlling federal precedent reveals it to be doctrinally unconvincing.

The "balancing" test adopted by the majority in this case is at odds with longstanding principles of Colorado search and seizure jurisprudence. We have held in countless cases that before an individual may be seized for a temporary investigation, three conditions must exist: (1) the law enforcement officer effecting the seizure must have a specific and articulable basis in fact for suspecting that the person has engaged in criminal activity, is presently committing a crime, or is about to do so; (2) the purpose of the temporary seizure must be reasonable; and (3) the scope and character of the seizure must be reasonably related to its purpose. *E.g., People v. Wilson,* 784 P.2d 325, 327 (Colo.1989); *People v. Ratcliff,* 778 P.2d 1371, 1376 (Colo. 1989); *People v. Melgosa,* 753 P.2d 221, 225 (Colo.1988); *People v. Carlson,* 677 P.2d 310, 315 (Colo.1984); *People v. Thomas,* 660 P.2d 1272, 1274 (Colo.1983); *People v. Tate,* 657 P.2d 955, 958 (Colo.1983); *People v. Schreyer,* 640 P.2d 1147, 1149 (Colo. 1982); *People v. Casias,* 193 Colo. 66, 72–77, 563 P.2d 926, 931–34 (1977); *Stone v. People,* 174 Colo. 504, 509, 485 P.2d 495, 497 (1971). This three-part standard for a temporary seizure of the person was developed with a conscious regard for the privacy interests of Colorado citizens under the Colorado Constitution. *See, e.g., Ratcliff,* 778 P.2d at 1375; *Thomas,* 660 at 1276–77; *Schreyer,* 640 P.2d at 1149.

Although the three-part test for a temporary or investigative seizure involves a balancing of the gravity of the public interest and the severity of the intrusion, the balancing or weighing aspect of the analysis is only part of the inquiry. The "balancing" factor, standing alone and devoid of the core component of reasonable individualized suspicion, is simply inadequate to support a temporary seizure under Colorado constitutional jurisprudence. *See, e.g., Ratcliff,* 778 P.2d at 1375–77; *Thomas,* 660 P.2d at 1274–76; *Schreyer,* 640 P.2d at 1149–50; *Casias,* 193 Colo. at 72–77, 563 P.2d at 931–34. The one lesson to be gleaned from our prior decisions in this area is that any balance must be struck so as to require that the officer effecting a temporary seizure act upon at least a "reasonable suspicion" that the person has engaged in, is engaging in, or is about to engage in, criminal activity. Dispensing with this "reasonable individualized suspicion" component of the three-part test is no more justified than dispensing with the probable cause prerequisite for a search warrant for incriminating evidence.

Colorado statutory law also recognizes a need for reasonable individualized suspicion before a temporary seizure of the person may be effected. § 16–3–103(1), 8A C.R.S. (1986), states:

A peace officer may stop any person who he *reasonably suspects is committing, has committed, or is about to commit a crime* and may require him to give his name and address, identification if available, and an explanation of his actions.

(Emphasis added). Although on July 5, 1986, the day on which the defendant was subjected to the highway sobriety checkpoint, Colorado statutory law provided that any licensee "shall have his driver's license in his immediate possession at all times when operating a motor vehicle, and shall display the same upon demand by any [law enforcement] officer," § 42–2–113, 17 C.R.S. (1984), we held in *People v. McPherson,* 191 Colo. 81, 550 P.2d 311 (1976), that this statute did not dispense with the reasonable individualized suspicion component of long-standing Colorado law. We there stated:

496

We do not believe that the legislature intended the statute to confer upon a police officer unlimited discretionary authority to stop any car at any time for any reason as long as he asked contemporaneously for display of a driver's license. A construction of the statute which would give to police officers such carte blanche authority would be inconsistent with section 16–3–103, C.R.S.1973, which specifically limits an officer's authority to stop persons for investigation in the absence of probable cause to arrest. The clear intent of section 42–2–113 is simply to permit the officer to demand the license of the driver whose vehicle has been stopped for an otherwise proper purpose.

191 Colo. at 84, 550 P.2d at 314. Moreover, in 1987 the General Assembly amended section 42–2–113 to require a motorist to hand over his or her driver's license "to any peace officer who has requested such person to do so *if such peace officer reasonably suspects that such person is committing, has committed, or is about to commit a violation of article 2, 3, 4, 5, 6, 7, or 8 of this title.*" § 42–2–113(1), 17 C.R.S. (Supp.1990) (emphasis added).

The constitutional jurisprudence and statutory law of Colorado reflect values, standards, and practices that are irreconcilable with the judicial legitimatizing of suspicionless temporary seizures of motorists solely on the basis of balancing the gravity of the public interest against the severity of the intrusion associated with the seizure. The majority's rejection of a reasonable individualized suspicion component as a necessary condition for a temporary seizure of the person under the Colorado Constitution results in subjecting all persons to the risk of governmental intrusions that, in my view, are antithetical to the precious "right to be let alone" contemplated by article II, section 7 of the Colorado Constitution. By adopting the "balancing" test in *Sitz* and engrafting that test upon the Colorado Constitution, the majority ignores the uniqueness and independence of our own constitution and denigrates the Colorado Search and Seizure Clause to an insignificant redundancy.

III.

The express purpose of the sobriety checkpoint program in this case was to detect and apprehend motorists who were operating their vehicles while intoxicated or under the influence of alcohol. The Operational Procedures Bulletin promulgated by the Chief of the Colorado State Patrol directed the checkpoint officers to stop each vehicle, approach the motorist, state that the purpose of the stop was to determine the sobriety of the driver, and to ask the driver for his or her license. The officers were directed to look for evidence of alcohol impairment, and only if no such evidence was found was the motorist to be directed to proceed on his or her way. According to the operational procedures, if the checkpoint officer observed an "odor of alcoholic beverage about the driver, slurred speech, flushed appearance, disorderly or unusual conduct, visual disorders and/or lack of muscular coordination," and if the officer reasonably believed that the motorist was under the influence of alcohol, the officer was then required to request the driver to perform certain "psychomotor coordination tests and/or submit to a chemical test of either his blood or breath." Although general questioning with respect to a driver's license and the associated observation of the motorist's demeanor and speech do not involve an intrusive search for personal characteristics hidden from public view, see *Carlson*, 677 P.2d at 316, the Operational Procedures Bulletin leaves no doubt that the purpose of the questioning and observation at the highway checkpoint is to discover evidence of the crime of drunken driving.

The operational procedures provided for publication of the dates on which sobriety checkpoints would be used, but the exact location and times of the checkpoints were to be kept confidential. The motorist approaching the checkpoint, therefore, would have no advance notice of any option other than to submit to the temporary seizure of his or her person for the associated questioning and observation by checkpoint officers. Moreover, even if some preliminary

sign or warning of the sobriety checkpoint might have been posted on the road, a motorist should hardly be put to the choice of foregoing his or her intended route of travel toward a particular destination or to submit to a suspicionless sobriety examination.

Although the operational procedures stated that no action would be taken against a motorist who turned around or turned off the highway to avoid the sobriety checkpoint unless "a specific action other than merely turning around would justify pursuit," it requires no great leap of imagination to realize that a motorist's act of turning around or off the highway would only draw further attention to the police with the resulting risk of an arbitrary exercise of discretion that might well result in a more intensive intrusion into the motorist's personal privacy and security. Indeed, if the facts of this case demonstrate anything, they quite clearly show that the sobriety checkpoint program places a motorist at the unfettered discretion of the checkpoint officers. When the defendant approached the checkpoint, he requested permission to make a right turn at the intersection to avoid the checkpoint examination. The checkpoint officer, however, denied the defendant's request and directed him to proceed to the parking area, which the defendant did. Notwithstanding the fact that the guidelines provided the motorist with the right to avoid the sobriety checkpoint program by turning around or off the highway, and notwithstanding the further fact that the checkpoint officer observed nothing at this point in time that would justify either pursuit or further detention of the defendant, the defendant was nonetheless denied his right under the guidelines to avoid the sobriety checkpoint and was required instead to submit to the checkpoint examination. These facts alone, in my view, render the seizure of the defendant in this case constitutionally unreasonable.

Lastly, irrespective of the majority's rejection of the reasonable individualized suspicion requirement for limited intrusions into personal privacy and security under the Colorado Constitution, I fail to see how the balancing process employed by the majority somehow weighs more heavily in favor of the state's interests rather than the motorist's right to personal privacy and security. The evidence shows that during the two and one-half hour period from 4:30 p.m. to 7:00 p.m. on July 6, 1986, the officers stopped 233 vehicles at the sobriety checkpoint without, however, arresting a single motorist for driving under the influence of, or while the motorist's ability was impaired by, intoxicating liquor. The majority seems to find solace in the fact that "the announcement and establishment of a sobriety checkpoint undoubtedly had some effect on advancing the state's interest in preventing drunken driving." Maj. op. at 489. I believe Justice Stevens' observations in his dissenting opinion in *Sitz* cogently put to rest the notion that dramatizing the public interest in the prevention of alcohol-related accidents somehow tilts the constitutional balance in favor of the checkpoint program. After noting that the shock value of the program may be its most effective feature, he echoed Justice Scalia's dissenting comments in *National Treasury Employees Union v. Von Raab*, 109 S.Ct. at 1401, to the effect that the "impairment of individual liberties cannot be the means of making a point."

Even symbolism for so worthy a cause as the abolition or deterrence of drunken driving, in my view, cannot validate an otherwise unreasonable and unconstitutional seizure of the person. The traditional "roving patrol" techniques of policing our highways and roads, the abolition of plea bargaining in drunken driving cases, and stringent administrative revocation or suspension of licenses provide effective means, consistent with constitutional processes, for combatting the threat to public safety caused by the drunken driver. Unfortunately, this court "is transfixed," as was the United States Supreme Court in *Sitz*, "by the wrong symbol—the illusory prospect of punishing countless intoxicated motorists—when it should keep its eyes on the road plainly marked by the Constitution," *Sitz*, 110 S.Ct. at 2499 (Stevens, J., dissenting).

If the Search and Seizure Clause of the Colorado Constitution is to retain any vitality in today's mobile society, it should be construed in a manner that vests a motorist on a public highway with the right to proceed to his or her destination without being required to submit to the seizure of his or her person, and associated questioning and observation of physical characteristics for evidence of intoxication, when there is a total absence of any cause whatever to suspect the motorist of drunken driving. The observations of the Rhode Island Supreme Court in *Pimental v. Department of Transportation*, 561 A.2d 1348, 1352 (R.I.1989), place in proper focus the true significance of this case. In invalidating on state constitutional grounds a "drunk-driving roadblock" program, implemented under guidelines promulgated by the state department of transportation, the court remarked:

> Even assuming that roadblocks may have some deterrent effect, we believe that it is purchased at too high a price. Doubtless other devices may also increase the effectiveness of law enforcement, including punishment without trial, repealing of the privilege against self-incrimination, dispensing with the right to confrontation of witnesses, and elimination of trial by jury. Such techniques, however, would diminish the rights of all in order to secure the punishment of a few.

I would affirm the suppression ruling on the basis that the evidence of the defendant's act of driving while his license had been denied was obtained as the direct result of an unconstitutional seizure of his person in violation of article II, section 7 of the Colorado Constitution.

LOHR and KIRSHBAUM, JJ., join in this dissent.

